31 S.W.3d 347 (2000)
In the Interest of M.J.M.L., a Child.
No. 04-99-00590-CV.
Court of Appeals of Texas, San Antonio.
September 27, 2000.
*349 David L. Willis, Willis & Wilkins, L.L.P., Michael D. Robbins, San Antonio, for appellant.
Scott Roberts, Asst. Criminal Dist. Atty., Kristin Hanson, San Antonio, for appellee.
Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

OPINION
Opinion by: KAREN ANGELINI, Justice.
The parents of M.J.M.L., Stephanie Michelle Maxon Bell-Ortega and Robert Michael Ortega, separately appeal an order terminating their parental rights. Robert complains that there was no evidence to support the trial court's conclusion that he engaged in conduct which endangered the physical or emotional well being of his child, and, alternatively, that due process required a showing of a causal connection between his conduct and the harm. Stephanie complains that the trial court erred in denying her motion for new trial based on the fact that she was not appointed counsel in a timely fashion. Because we find no reversible error, we affirm the order of termination as to both parents.

BACKGROUND
Stephanie Bell-Ortega delivered her baby, M.J.M.L., immediately after she was arrested on drug charges, and named three men as possible fathers. The baby was born with narcotics in his system. Five days later Appellee, the Texas Department of Protective and Regulatory Services ["the Department"], filed its "Original Petition in A Suit Affecting the Parent-Child Relationship and To Terminate the Parent-Child Relationship." By order that same day, the Department was named temporary managing conservator of the child. After lengthy treatment for drug withdrawal, the infant M.J.M.L. was released from the hospital and placed in a foster home, where he has since remained. Stephanie was convicted on her drug charges and remained incarcerated through the date of trial. At the six-month review hearing, Robert Ortega judicially admitted he was M.J.M.L.'s father. At trial, both Stephanie and Robert appeared in opposition to the termination of their parental rights. M.J.M.L.'s foster parents also appeared and expressed their desire to adopt him. After hearing the evidence, the trial court concluded there was clear and convincing evidence supporting termination of Stephanie's and Robert's parental rights pursuant to the Texas Family Code. See Tex. Fam.Code § 161.001(1) (Vernon 1996)(listing the statutory grounds which must be proven in order to terminate parental rights). Robert and Stephanie separately appeal the termination. We will address Robert's issues first, then turn to Stephanie's issues.

*350 THE FATHER
Robert Ortega raises two issues on appeal: (1) no evidence supported the termination of his parental rights, and (2) he was denied his constitutional rights of due process. We address each in turn.

Legal Sufficiency of the Evidence
Robert asserts in his first issue that there was no evidence to support the trial court's findings with respect to the statutory ground for termination pled by the Department. A "no evidence" issue is a challenge to the legal sufficiency of the evidence. See In the Interest of M.H., L.H. and A.H., 745 S.W.2d 424, 427 (Tex. App.-Houston [14th Dist.] 1988, no writ).
The Department bore the burden to prove the existence of a properly pled statutory ground for termination under the Texas Family Code, and that termination was in the best interests of the child. See TEX. FAM.CODE. § 161.001 (Vernon 1996); In the Interest of G.M., 596 S.W.2d 846, 847 (Tex.1980). The standard of proof is the clear and convincing evidence standard. See id. The statutory ground at issue in this case is found in section 161.001(1)(E) of the Family Code: "the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." See Tex. Fam.Code § 161.001(1)(E) (Vernon 1996). The trial court found by clear and convincing evidence that Robert engaged in conduct or knowingly placed the child with persons who engaged in conduct which physically or emotionally endangered the child, and that termination of Robert's parental rights was in the best interests of the child. Robert only challenges the court's findings with respect to the existence of statutory grounds; he does not challenge the court's findings with respect to the best interests of the child.
A legal sufficiency challenge will be sustained only when the record shows: (1) complete absence of evidence of a vital fact, (2) the trial court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) no more than a scintilla of evidence was offered to prove a vital fact, or (4) the evidence conclusively established the opposite of a vital fact. See Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997). To determine whether there is legally sufficient evidence, all the record evidence and inferences must be viewed in the light most favorable to the finding. See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998). Anything more than a scintilla of evidence is legally sufficient to support the finding. See id.
The cornerstone of Robert's sufficiency argument is that the trial court was precluded by law from considering portions of the evidence offered. We will first address those arguments, then turn to our legal sufficiency analysis of the record.
a. Evidence Admissible to Prove Statutory Ground for Involuntary Termination
Given the consummate significance of the termination of a parent's rights to his child, parental termination proceedings are strictly scrutinized on appeal and involuntary termination statutes are strictly construed in favor of the parent. See In the Interest of Shaw, 966 S.W.2d 174, 179 (Tex.App.El Paso 1998, no pet.). The Texas Supreme Court has held that the word "endanger" in the context of section 161.001 of the family code means to "expose to loss or injury; to jeopardize." Texas Dept. of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). While subsection (E) endangerment must be a direct result of a parental course of conduct, the conduct described does not have to be specifically directed at the child; nor does it have to cause an actual injury to the child or even constitute a concrete threat of injury to the child. See In re M.C., 917 S.W.2d 268, 269 (Tex.1996); In the Interest *351 of R.D., 955 S.W.2d 364, 368 (Tex.App.San Antonio 1997, pet. denied). Rather, the statute is satisfied by showing that parental conduct simply jeopardized the child's physical or emotional well-being. See Director of the Dallas Cty. Child Protective Servs. Unit v. Bowling, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). The parental course of conduct includes both the parent's actions and the parent's omissions or failures to act. See In the Interest of B.S.T., 977 S.W.2d 481, 484 (Tex. App.-Houston [14th Dist.] 1998, no pet.).
Robert first argues that the trial court could not consider any evidence of conduct which may have occurred before the child was born, referring us to the definition of "child" in section 101.003 of the code. TEX. FAM.CODE § 101.003 (Vernon 1996)("`Child' or `minor' means a person under 18 years of age who is not and has not been married or who has not had the disabilities of minority removed for general purposes."). Robert asserts that this definition of child precludes consideration of events which occurred before a child was born. However, no court has held, and we do not find that the statutory definition of "child" conflicts with a definition of a course of conduct endangering a child which incorporates conduct occurring before and after a child's birth. Texas courts look to what the parent did both before and after the child's birth to determine whether a course of conduct endangering the child exists. See Avery v. State, 963 S.W.2d 550, 553 (Tex.App.-Houston [1st Dist.] 1997, no pet.); Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.Dallas 1995, no writ).
Robert next argues that as a matter of law the trial court cannot consider evidence of conduct which may have occurred before the rendition of a valid paternity order, citing our opinion in Djeto v. Texas Dept. of Protective & Regulatory Servs., 928 S.W.2d 96 (Tex.App.San Antonio 1996, no writ). He misapplies our holding. The father in Djeto did not know the child was his. See id. at 97. We held that evidence of his conduct prior to the determination of paternity could not be considered in a determination of whether he knowingly placed or allowed the child to remain in conditions or surroundings endangering her physical or emotional well-being. See id. at 98. The termination was thus based on section 161.001(1)(D) of the family code, which is the knowing placement of a child in an endangering environment. As this court recently explained in In the Interest of Stevenson, 27 S.W.3d 195, 201-03 (Tex. App.-San Antonio 2000, no pet. h.), while knowledge of paternity is a prerequisite to a showing of knowing placement of a child in an endangering environment, it is not a prerequisite to a showing of a parental course of conduct which endangers a child under section 161.001(1)(E). See also In the Interest of M.D.S., 1 S.W.3d 190, 198 (Tex.App.-Amarillo 1999, no pet.). We overrule Robert's argument on the admission of conduct evidence occurring prior to the child's birth. Having addressed Robert's evidentiary concerns, we now turn to our legal sufficiency analysis of the record.
b. The Evidence is Legally Sufficient to Support the Termination Order
Our review of the record in the light most favorable to the trial court's findings reveals more than a scintilla of evidence to support the finding that Robert engaged in a course of conduct which endangered M.J.M.L.'s physical health and well-being. There was evidence that Robert knew M.J.M.L.'s mother, Stephanie Bell-Ortega, was a drug addict. Robert and Stephanie lived together for several years before M.J.M.L. was born. Stephanie testified she was using drugs while living with Robert, and there was physical evidence of extensive track marks on her arms, which presumably Robert was aware of. Their first child, Justin, was born with drugs in his system, as was M.J.M.L. In the spring before M.J.M.L. was born, while Stephanie was pregnant, she and Robert were arrested in their son Justin's presence. Drugs and drug paraphernalia *352 were found in their car at the time. While Robert later attempted to get help for Stephanie by taking her to a rehabilitation clinic in Dallas, he knew she left the clinic before having the baby and came back to San Antonio to do drugs. He did not come with her; instead he disappeared for at least five months. He later told witnesses he had turned himself into the Navy for a decade-old AWOL violation and served time for it in Florida. He did this at the end of Stephanie's pregnancy and he did not make arrangements for the care of his soon-to-be-born son during the time he was gone, choosing instead to leave him in the care of a drug-addicted mother.
M.J.M.L. was born literally while Stephanie was being arrested, hence the Department obtained temporary custody of the infant. There is some evidence that Robert contacted the Department shortly after M.J.M.L.'s birth and requested the Department give M.J.M.L. to his mother. However, Robert refused to tell the Department where he was and without more proof, the Department had no way of knowing at the time he was actually M.J.M.L.'s father. This initial evasiveness and refusal to cooperate with the Department continued throughout the eighteen months between M.J.M.L.'s birth and the time of trial. While Robert judicially admitted he was M.J.M.L.'s father in April 1998 and he paid child support when ordered to by the court, he never provided to the Department basic information about himself such as his address, nor did he comply with the service plan approved by the trial court. He submitted to a psychological evaluation but he did not maintain monthly contact with the Department, take the required parenting classes or complete a substance abuse assessment. A representative of the Department and a CASA volunteer both testified they visited an address in Robstown, Texas represented by Robert as his and found an empty, boarded-up shack. When Robert was informed by his "neighbor" of the Department representative's visit, he called the representative and accused her of harassing him. Robert agreed to studies of his mother and his neighbors as possible placements for M.J.M.L. when they were caring for his other son Justin; however, he removed Justin from their care before the Department could conduct the studies and the studies had to be dropped.
Reading the record in the light most favorable to the verdict, we find some evidence to support the trial court's finding that Robert engaged in a course of conduct endangering the physical and emotional well-being of his son, M.J.M.L. Robert's legal sufficiency challenge is overruled.

Denial of Due Process
In his second issue, Robert argues that he was denied due process under the United States and Texas constitutions because the Department did not establish a causal connection between his conduct and any harm to his child. Specifically, he challenges the constitutionality of the supreme court's holding in Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531 (Tex.1987).
The Department responds that Robert has waived this causation issue because he did not raise the issue in the trial court. Constitutional issues must be properly raised in the trial court or they are waived on appeal. See In the Matter of W.A.B., 979 S.W.2d 804, 808 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); Segovia v. Texas Dep't of Protective and Regulatory Servs., 979 S.W.2d 785, 788 (Tex.App.-Houston [14th Dist.] 1998, pet. denied).
At trial, Robert's counsel argued that Robert's rights could not be terminated under section 161.001(1)(E) because Robert never had custody of or access to the child. He did not argue that the Department had to prove a causal connection between his behavior and any harm to the child, nor did he make a constitutional due process argument during the hearing. We note that at one point during the hearing the mother's counsel interjected a constitutional *353 due process argument, presumably on Robert's behalf. However, Robert's counsel then deliberately narrowed the argument to the trial court by saying "The fact remains that there was no child in existence for my client to do anything with. There's no child to place. There's no child to engage in conduct with. And until that childMy position is: Until that child is born, my clientIt's a physical impossibility for him to do anything with that child." In his motion for new trial, Robert did assert a constitutional claim, but again, he did not argue the causation issue. Instead, he urges that section 161.001(1)(E) "is unconstitutional because it is used herein to terminate parental rights without requiring parental conduct as a basis, to wit, ROBERT M. ORTEGA NEVER had possession or control of [M.J.M.L.], the child being taken from the mother at birth."
On appeal, Robert's position is that even if he engaged in conduct endangering the child, the State failed to make a causal connection between his conduct and any harm to the child. This is a different issue from the one he urged at trial. Thus, Robert failed to preserve this issue.
We note, however, that even if the causal connection due process argument was properly presented to the trial court, Robert has failed to show how section 161.001(1)(E) violated his constitutional right to due process. In his brief, he asks this court to analyze three cases. First, he cites Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531 (Tex.1987) and concedes that, in that case, the Texas Supreme Court does not require a showing of a causal connection between the parent's conduct and actual harm to the child. However, the supreme court did not specifically discuss the constitutional due process issue. Second, Robert cites Harris v. Herbers, 838 S.W.2d 938 (Tex.App.-Houston [14th Dist.] 1992, no writ), which he argues stands for the proposition that a causal connection must be established before parental rights can be terminated. Again, however, there is no discussion of the constitutional right to due process in that case and Robert fails to show how the case supports his argument. Third, Robert cites In the Matter of W.A.B., 979 S.W.2d 804 (Tex.App.-Houston [14th Dist.] 1998, no pet.) which he argues "left the door open on the causal connection question" because the constitutional issue was not raised in the trial court and was, therefore, waived on appeal. We disagree with Robert's conclusion. While the Houston court did state that the constitutional challenge was waived because it was not raised in the trial court, the court also refused to rule on the due process issue because there was nothing in the facts of that case that would make it an exception to the Texas Supreme Court's interpretation of section 161.001(1)(E). See W.A.B., 979 S.W.2d at 808. Likewise, we can find nothing in the facts of this case to justify a departure from the supreme court's interpretation of section 161.001(1)(E). In conclusion, Robert has simply failed to show how section 161.001(1)(E) violates his constitutional due process rights. Robert's two issues are overruled and the order of termination against him is affirmed.

THE MOTHER

Appointment of Attorney Ad Litem
Stephanie Bell-Ortega complains in two issues that the trial court violated Texas Family Code section 107.013(a)(1) and the due process clause of the U.S. Constitution by failing to appoint an attorney ad litem for her until six months after the Department filed its original petition to terminate the parent-child relationship.
At the outset, we note that Stephanie was represented by appointed counsel for over a year before the actual trial date. She does not complain on appeal that she was not given effective representation during that time or at trial on the merits. See In the Interest of B.B. & P.B., 971 S.W.2d 160, 172 (Tex.App.Beaumont 1998, pet. denied)(the right to effective assistance of *354 counsel in criminal actions does not apply to a civil proceeding for termination of parental rights). Stephanie's issues relate only to the six month delay from the time this suit was filed to the date of the appointment of her first attorney.
a. Section 107.013
In Texas the appointment of an attorney for indigent parents in termination cases is mandated by statute. Section 107.013(a)(1) of the Texas Family Code provides that:
In a suit in which termination of the parent-child relationship is requested, the court shall appoint an attorney ad litem to represent the interests of:
(1) an indigent parent of the child who responds in opposition to the termination.
TEX. FAM.CODE ANN. § 107.013(a)(1) (Vernon Supp.2000).
Complete failure of a trial court to appoint counsel for indigent parents constitutes reversible error. See Odoms v. Batts, 791 S.W.2d 677, 679-80 (Tex.App.-San Antonio 1990, no writ); In the Interest of T.R.R., 986 S.W.2d 31, 37 (Tex.App.-Corpus Christi 1998, no pet.). However, the Legislature did not set forth any time frame or procedure by which trial courts must appoint counsel. Stephanie urges us to interpret section 107.013(a)(1) to require appointment of an attorney immediately after the filing of a petition to terminate the parent-child relationship, before any hearings are held in the case.
While we recognize that involuntary termination of parental rights statutes must be strictly construed in favor of parents, see Odoms, 791 S.W.2d at 680 (citing Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985)), it is a well established canon of statutory construction that every word excluded from a statute is presumed to be excluded for a purpose. See Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex.1981); Zajac v. Penkava, 924 S.W.2d 405, 409 (Tex.App.-San Antonio 1996, no writ). The more open-ended language of section 107.013(a)(1) directly contrasts with the preceding section which mandates the appointment of an attorney ad litem for children involved in termination proceedings "immediately after the filing [of the suit], but before the full adversary hearing." TEX. FAM.CODE ANN. § 107.012 (Vernon 1996)(referring to the hearing required to take place fourteen days after a governmental entity is awarded possession of a child. See TEX. FAM. CODE ANN. § 262.201 (Vernon 1996, Vernon Supp.2000)). Presumably, if the Legislature wished to impose a similar deadline for appointment of counsel for indigent parents, it would have done so. We decline to read such a deadline into the statute. The appointment of counsel six months after the case began was not in itself a violation of section 107.013(a)(1). Stephanie's first issue is overruled.
b. Constitutional Due Process
Stephanie also asserts that the trial court's dilatory appointment of counsel deprived her of constitutional due process of law. Due process under the Fourteenth Amendment protects individuals against arbitrary government acts regardless of the fairness of the procedures used to implement them. The United States Supreme Court held in Lassiter v. Department of Soc. Servs., 452 U.S. 18, 31-32, 101 S.Ct. 2153, 68 L.Ed.2d 640, 652 (1981) that the due process clause does not require appointment of counsel in every parental termination proceeding, and the decision whether due process calls for appointment of counsel is best left to the trial court, subject to appellate review. As we stated, in Texas the timing of appointment of counsel to indigent parents appearing in opposition to termination is a matter within the trial court's discretion. Therefore, in our due process review, we look to the facts and circumstances of this case to determine whether the trial court's action was arbitrary and a violation of Stephanie's due process rights. See Lassiter, 452 U.S. at 32, 101 S.Ct. 2153.
*355 The Department filed its suit affecting the parent-child relationship and petition to terminate parental rights on October 21, 1997, five days after M.J.M.L. was born. At that time, and at all times relevant to this proceeding, Stephanie was incarcerated. Two hearings were conducted prior to April 23, 1998, the six-month status review date. Stephanie was not represented by counsel at either hearing.
Stephanie was also not present at the first full adversary hearing October 29, 1997. At that hearing, the trial court and counsel for the Department engaged in discussion which evidenced that the immediate intended course of action was to formulate a service plan with the goal of reunification and to ensure the mother's compliance with the plan. The Department requested that Stephanie be appointed an attorney ad litem at that time, and the trial court indicated that it would do so. For whatever reason not apparent from the record before us, the appointment was not made at that time.
At the sixty-day status review hearing on December 4, 1997, counsel for the Department put Stephanie on the stand, where she underwent extensive questioning by the Department, the child's attorney ad litem, and the trial court about the paternity of her baby, her other children and their whereabouts, her drug use and her criminal history. She was admonished several times that she was testifying under penalty of perjury. She was further admonished by the trial court that, if she did not change her lifestyle and follow the service plan, her rights to her children could be restricted or terminated. Stephanie was still not represented by counsel at this time.
The record indicates a subsequent hearing to review the service plan was held December 18, 1997, but we do not have a reporter's record from that hearing before us.
The next hearing in the case was the six-month review hearing which was held April 23, 1998. Both Stephanie and the father, Robert Ortega were present and testified at the hearing. The Department indicated that they were providing services to Stephanie pursuant to the service plan and that the case was "dual-tracked" for termination and reunification, which meant that even though a termination petition was on file Stephanie still had an opportunity to work with the Department to prevent the termination. While Stephanie was not represented by counsel at the hearing, the trial court appointed Irene Whitt as Stephanie's first attorney ad litem that day.
Stephanie was represented by Whitt until the March 23, 1999 pretrial conference, at which she, the attorney for the Department and the ad litem attorney for the child all asked the trial court to discharge Whitt. The court then appointed Michael Bowles to take her place. Bowles filed a motion for continuance of the trial setting; however, at the hearing on the motion Stephanie requested it be withdrawn. The case was tried on May 3-5, 1999, approximately six weeks after Bowles was appointed.
In summary, the record shows that a request was made by the Department outside Stephanie's presence for the appointment of her counsel at the first adversary hearing, and was agreed to but not followed up on by the trial court. The record also shows that Stephanie was later required to testify extensively in two preliminary hearings without the benefit of counsel.
However, the record does not show that she requested counsel at either hearing. Further, the record shows that at the time of those hearings the goal of the Department was the reunification of Stephanie and her child. The Department made clear its intent to dual-track the case for termination as well as reunification at the six-month hearing, and the trial court appointed counsel for the parents at that time. Once counsel was appointed Stephanie had more than a year to prepare for *356 trial. There is no indication in the record before us that she complained about Whitt's services prior to the date Bowles was appointed. Then, after withdrawing Bowles' motion for continuance, Stephanie testified at trial that she was completely satisfied with Bowles' representation. These facts do not show that the trial court acted arbitrarily in delaying appointment of counsel until the Department announced it was dual-tracking the case for termination, nor do they show that Stephanie was deprived of her substantive due process rights. Cf. Ybarra v. Texas Dep't of Human Servs., 869 S.W.2d 574, 580 (Tex.App.-Corpus Christi 1993, no writ)(no error in failure to appoint counsel when appellant did not request counsel and was represented by counsel at trial). Stephanie's second issue is overruled and the order of termination against her is affirmed.
Concurring and dissenting opinion by: SARAH B. DUNCAN, Justice.
DUNCAN, Justice, concurring and dissenting.
I concur in the court's judgment affirming the termination of Stephanie Bell-Ortega's parent-child relationship with M.J.M.L. But I must dissent to the judgment affirming the termination of Robert Ortega's parental rights.

STANDARD OF REVIEW
Ortega challenges only the legal sufficiency of the evidence. In the context of the termination of parental rights, we review legal sufficiency complaints under the same standard employed in other types of cases. In re R.D., 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied). Accordingly, we must determine whether there is "(a) a complete absence of evidence [as to the challenged element]; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove [the challenged element]; (c) the evidence offered to prove [the challenged element] is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the [challenged element]." Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 TEX. L.REV. 361, 362-63 (1960). Evidence is no more than a scintilla when it "is so weak as to do no more than create a mere surmise or suspicion of its existence." Id. at 363. If reasonable minds cannot differ that evidence is not probative of the vital fact, it is, in legal effect, no evidence. See Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).

APPLICABLE LAW
As the majority states, the only statutory ground for termination at issue is section 161.001(E) of the Texas Family Code, which provides:
The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence... that the parent has ... engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child....
TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.1999). Endangering a child involves "`more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" In re M.C., 917 S.W.2d 268, 269 (Tex.1996) (quoting Texas Dept. of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987)). To "endanger" means "`to expose to loss or injury; to jeopardize.'" Id. However, "`it is not necessary that the conduct be directed at the child or that the child actually suffers injury.'" Id.
"Child," as defined by the Family Code, "means a person under 18 years of age who is not and has not been married or who has not had the disabilities of minority removed for general purposes." Id. § 101.003. As a general rule, the term "person" does not include a fetus. See Roe v. Wade, 410 U.S. 113, 158, 93 S.Ct. 705, 35 *357 L.Ed.2d 147 (1973) ("person," as used in the Fourteenth Amendment to the United States Constitution, does not include the unborn); Witty v. American General Capital Distributors, Inc., 727 S.W.2d 503, 504 (Tex.1987) (an unborn fetus is not an "individual" or "person" within the meaning of the wrongful death statute); TEX. PENAL CODE ANN. §§ 1.07(a)(26), (38) (defining "individual" as "a human being who has been born and is alive" and defining "person" as "an individual, corporation, or association"), 22.04(c)(1) (defining "child" as "a person 14 years of age or younger") (Vernon 1994).

PRE-BIRTH CONDUCT
In affirming the judgment against Ortega, the majority holds we may consider "what the parent did both before and after the child's birth." 31 S.W.3d at 351 (citing Avery v. State, 963 S.W.2d 550, 553 (Tex. App.-Houston [1st Dist.] 1997, no pet.), and Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.-Dallas 1995, no writ)). In the majority's view, the statutory definition of "child" does not conflict with consideration of pre-birth conduct. 31 S.W.3d at 351. I cannot agree, either as a matter of statutory construction or public policy.
Statutes authorizing the termination of parental rights must be strictly construed in favor of the parent. Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). In light of this rule of strict construction and the statutory definition of "child" in the Texas Family Code and the related definitions of "person" in Texas statutory and case law, we cannot construe section 161.001(1)(E) as permitting termination of the parent-child relationship for prenatal endangering conduct. This conclusion is buttressed by the grounds for termination set forth in section 161.001(1). Most of these grounds necessarily relate to post-birth conduct. See TEX. FAM.CODE ANN. § 161.001(1)(A)-(C), (F), (G), (I), (J)(N), (O), (Q), and (S) (Vernon Supp.1999). Indeed, when the Texas Legislature intended for pre-birth conduct to justify termination, it made its intention perfectly clear. See id. at § 161.001(1)(H) ("voluntarily, and with knowledge of the pregnancy, abandoned the mother of the child beginning at a time during her pregnancy with the child and continuing through the birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child, and remained apart from the child or failed to support the child since the birth"); id. at § 161.001(1)(L)-(M) (conviction or community supervision for criminal responsibility for the death or serious injury of a child); id. at § 161.001(1)(R) (parent was cause of child being born addicted to alcohol or a controlled substance). I therefore must conclude the Texas Legislature intended for pre-birth conduct to justify termination only when the conduct is expressly encompassed by a statutory ground for termination. Since pre-birth conduct is not expressly mentioned in section 161.001(1)(E), it is not probative in this case.

FAILURE TO COMPLY WITH SERVICE PLAN
The majority also relies upon evidence that Ortega failed to cooperate with the Department and failed to comply with its service plan. However, the trial court admitted this evidence solely for purposes of establishing M.J.M.L.'s best interests, as the following exchange makes clear:
Q: All right. Now, did you take that opportunity to go over with [Ortega] the plan that you had previously developed in his absence?
A: Yes.
Ortega's attorney: Objection, Your Honor. Going to have to object to any references to the plan of service in this case. It is not plead as a ground for termination.
State's attorney: Your Honor, it goes to best interest, that we have to show that we have attempted to work with this man and that he hasn't responded.

*358 The Court: Overruled.
Ortega's attorney: Your Honor, well, I reurge my objection, Judge.
The Court: Well, it doesn't go to the grounds for termination. It goes to best interest.
Ortega's attorney: But the Code was amended, if I may?
The Court: Sure.
Ortega's attorney: May I address the Court? September 1st, 1997, Judge, the Family Code was amended to specifically set out as a basis for termination failure or failure to comply with the service plan or failure to cooperate with the plan of service developed by the Department. That has not been plead by the Department or any ad litem in this case. I cannotin good conscience, I cannot agree to try that issue by consent, nor can I agree to a trial amendment on that issue. It is a specific ground, and this case was filed after September 1st, 97.
The Court: I understand that, and I'm not allowing it in on a specific ground, nor will I allow it to be tried by consent due to your objection, but I'm going to allow that information to come in on the second prong, best interest of the child.
....
The Court: I will give you a running objection, too.
See TEX.R. EVID. 105(a). The State has not complained of the court's ruling. Thus, in addressing the legal sufficiency of the evidence to support the trial court's finding under section 161.001(1)(E), we may not consider evidence that Ortega failed to comply with the service plan or cooperate with the Department.

PAST RESIDENCE
The majority also appears to rely on evidence that, after M.J.M.L.'s birth, Ortega lived for some period of time in an "empty, boarded-up shack." I agree this is some evidence from which it might be inferred that Ortega's living conditions, at least at some point in the past, might have jeopardized M.J.M.L.'s physical and emotional well-being. But this is not the test. Rather, Ortega's conduct must have exposed M.J.M.L. to loss or injury. This test is plainly not met since Ortega has never had custody, control, or possession of the child.

SUGGESTION OF RELATIVE PLACEMENT
Finally, the majority relies upon evidence that the person Ortega suggested as a relative placement, his mother, was not evaluated because she no longer cared for Ortega's other son. However, there is no evidence of the suitability of Ortega's mother as a caregiver for M.J.M.L. Thus, Ortega's suggestion of his mother is a relative placement is not probative of whether he engaged in conduct that endangered M.J.M.L.'s physical and emotional well-being.

CONCLUSION
So far as I can discern, the only probative evidence of whether Ortega may have jeopardized M.J.M.L.'s physical or emotional well-being is that he visited M.J.M.L. only three times in eighteen months, and he failed to ask CPS caseworkers about his son's special needs. This is not in my view legally sufficient evidence to support the trial court's finding of endangering conduct. As the CPS caseworker, Richard Guzman, testified:
Q: [H]as Mr. Ortega, Robert M. Ortega, the respondent here, engaged in any conduct which would damage or which would endanger the physical or emotional well-being of [M.J.M.L.]?
A: Not to my knowledge, sir.
Q: And he is notyou have already testified, he hasn't placed the child with anybody; he hasn't had that ability, correct?
A: Yes, sir.
*359 To terminatefinally and irrevocably a child's relationship with his father is a decision of constitutional magnitude. It may be that Ortega cannot parent M.J.M.L. But the Department has not proved its case in this proceeding. I therefore dissent to the majority's judgment affirming the termination of Robert Ortega's parent-child relationship with M.J.M.L.