TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00653-CV






Pedro Castorena and Penny Renee Delgado, Appellants




v.




Texas Department of Protective and Regulatory Services, Appellee






FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT


NO. 2001-0993, HONORABLE DON B. MORGAN, JUDGE PRESIDING 






M E M O R A N D U M O P I N I O N




 After a bench trial, the court found by clear and convincing evidence that the parental
rights of Pedro Castorena (Castorena) and Penny Renee Delgado (Delgado) should be terminated. 
In two issues on appeal, each contends that the evidence was factually insufficient to support the
grounds for termination and to support a finding that the termination was in the children's best
interest. (1)


Background



 Delgado is the mother of the four children involved in this termination suit. M.D.,
the oldest, was born in February 1994. M.D.'s father is Miguel Delgado, Penny Delgado's second
husband, to whom she was still legally married at the time of trial. F.H., whose father is Jose
Hernandez, was born in June 1997. (2) M.D.C. was born in March 1999, E.D.C. in June 2000. 
Castorena is the father of the two youngest children.


History of Involvement with CPS (3)


 The referral that ultimately resulted in the filing of these termination proceedings
occurred in July 2001. Julie Melton, the CPS investigator handling the referral, discovered that CPS
had conducted investigations into this family dating back to December 1995 for physical and medical
neglect, physical abuse, and neglectful supervision. (4) Although services were offered on more than
one occasion, no previous referral resulted in the children being removed from the home. The
December 1995 referral alleged, among other things, that Delgado's boyfriend locked her out in the
cold, along with her baby clothed only in a diaper; maggots were found in the sink and in the couch
where the baby had been sleeping.

 In June 1997, Seton Home Health Care became involved with the family because
Delgado had alcohol in her system when F.H. was born and admitted a lack of child care knowledge. 
Delgado also admitted that she was in an abusive relationship with F.H.'s father. She said that on
several occasions he had kicked the car seat while F.H. was in the seat. Delgado said that her mother
had been married seven times and the different husbands had abused her and her siblings until CPS
intervened and pressured the men to move; Delgado said she supposed CPS would have to do the
same with her.

 In September 1997, a police officer contacted Delgado because three-year-old M.D.
was running around the apartment complex, including the pool area, unsupervised. Delgado told the
police officer that M.D. was bright and could handle herself. In October 1997, Delgado told a CPS
worker that she did not see any danger in letting M.D. play outside at the complex unsupervised. 
She further told the caseworker that she had been in jail for hitting M.D.'s father with a hammer
because she wanted to get back together and he refused.

 A July 1999 referral alleges that Delgado reported to law enforcement that Castorena
abused M.D. by kicking the child in the back and flicking a beer-bottle cap at her, striking her under
the eye. In January 2000, Delgado was investigated for leaving six-year-old M.D. to care for the
younger children. She admitted to a pattern of leaving the children alone for as long as an hour while
she went to the store with Castorena. M.D. was not in school because she did not have
immunizations. In February 2000, Delgado told the caseworker that Castorena regularly beat her and
hit the children. Sometimes he withheld food. At that point, the Department started family-based
safety services. The case worker noted poor bonding and attachment between Delgado and the
children; lack of supervision and chronic neglect; dirty children with chronic lice; medical treatment
was not sought for the children and Delgado did not obtain prenatal care, although she was
approximately six months pregnant. Castorena apparently never sought medical care on her behalf. 
There was a history of domestic violence between Delgado and Castorena, which Delgado 
minimized as "arguing." At a March 2000 visit, there was no food in the house. A woman's shelter
provided a bus ticket to Georgia so Delgado and the children could stay with some of Delgado's
relatives.

 When Delgado relocated to Georgia, the Department had been at the point of
removing the children because of Castorena's presence. She returned to Texas in April of 2000 and
moved into a mobile home in Kyle. The Department understood that Castorena would not live there
but he moved in within three days. Services started again in August 2000.


Referral Leading to Removal


 In July 2001, CPS picked up the children based on a referral alleging that Delgado
abandoned the children. Delgado left the children at Maria Rodriguez' house. Delgado told
Rodriguez that she was going to go fill out some job applications. Rodriguez thought Delgado
would be gone for a couple of hours, but after three days she had not returned. Not knowing how
to contact Delgado, Rodriguez called the police, who took the children to their maternal grandmother
for only one day, after which CPS picked them up. Melton said that the children stated that before
being left with Rodriguez, they had been sleeping in the car at rest stops. The children did not know
where their mother was.

 The children were picked up on July 12; Delgado contacted Melton on July 16. She
said that Castorena had evicted them from the mobile home in Kyle in May. Even before evicting
them, Castorena had the electricity turned off. The children lived there for about a month longer. 
After being evicted they had been sleeping at rest stops, as well as staying with friends and with
persons contacted through Delgado's church. She was not working, but her pastor had been helping
with some money and supplies. Delgado claimed that Rodriguez had agreed to care for the children
for four or five months while Delgado looked for work.

 F.H. told the children's guardian ad litem, Jill McLaughlin, that the children slept on
the road, not in the car. There were maggots in the car. McLaughlin testified that she feels that
Delgado takes very little responsibility for anything. Based on her conversation with Rodriguez, she
thought the children had been abandoned. McLaughlin did not believe Delgado was simply looking
for a job.

 Ms. McLaughlin testified that the Department made extensive efforts to find a relative
with whom the children could be placed. For a variety of reasons, none of Delgado's relatives could
keep them. Castorena could not provide a name of any of his relatives who were in the country
legally. However, Delgado said that she took the children to Castorena's mother, who refused to
help Delgado by keeping the children temporarily because she wanted Castorena to have custody.


Criminal History and Violence


 Delgado admitted that she and Castorena were physically violent to each other.
Delgado characterized herself as "more violent than Pedro [Castorena]." In addition to attacking
Miguel Delgado with a hammer (with one or more children present) because he would not get back
together, she admitted threatening Castorena's sister with a knife and was on probation for a
terroristic threat conviction based on this incident. Cheryl Reitz of the Hays County probation office
testified that a motion to revoke probation was filed because Delgado failed to obey the court's
orders to keep gainful employment, failed to report on one date, failed to pay probation fees one
month, and failed to obey the admonishment to have no contact with Castorena. The probation file
noted a history of domestic violence between the two.

 Castorena had had a misdemeanor assault charge in 1999 and later was on deferred
adjudication for another. Castorena told Reitz that he was concerned about his safety, that Delgado
was stalking him and causing him to lose jobs. He wanted a protective order against her. Delgado
took the children over to a neighbor where Castorena was staying and said that she might have to kill
Castorena. Castorena apparently took no steps to protect the children against any possible violence.


Stability


 David Sweet, pastor of the Hays Hills Baptist Church, testified that he tried to help
Delgado with several crises in her life over a several-month period in 2000. He found places for the
children to stay when Delgado spent time in jail. Sweet testified that he began to see that Delgado
cared for the children, but she did not have the desire or maturity to do what it took to protect them. 
He was concerned that she had no safety net; her parents would not take the kids because of where
they were living. He could not believe that Castorena did not care for her and give her any support. 
In several homes in which she stayed in the summer of 2000, Delgado was asked to leave after a
short stay because of her irresponsibility and personality conflicts. Sweet was particularly concerned
about one place she stayed because of a large number of single adult males living there.

 He testified that the church gave her a car seat, but she did not make any effort to
buckle it in the car, so the car seat was freestanding. At the time, Delgado and the children were
living in the car. The people with whom she stayed in three different homes said that Delgado would
party at night, would go out and leave the kids, forcing M.D. to change diapers and otherwise be the
responsible party. Sweet said that Delgado relied on M.D. to take care of the baby more than he
thought appropriate. The baby was not changed very often; the other children were often dirty. He
ultimately concluded that Delgado did not have the maturity or stability to keep the children and take
care of them. "She loved the kids like a ten year old would love them." Delgado called him and
asked him to pray because she was trying to get the kids back; he told her he could not do so. "I
prayed for her to lose the kids because I finally realized that nothing was going to change."

 Pamela Bloss testified that Delgado and the children stayed with her for about a
month in the fall of 2000. When the children arrived, they had a lot of infected sores and "were
overriden with lice." They barely knew what many different kinds of food were. She said there was
at least one time when Delgado was gone all night. She was convinced that Delgado was not capable
of taking care of the children; Delgado did not interact with the children as a mother. After a while,
Bloss said that she "just wanted her to go somewhere else. I just couldn't take the fact of all the
children and being left in [my] care all the time because I also had my own children to care for."


Therapist's Concerns


 Richard Sears, the therapist for the two oldest children, began seeing M.D. in October
2001. He testified that M.D. had difficulties in socialization, night terrors, bedwetting, and
difficulties with reading and language. M.D. had difficulties understanding safe relationships with
adults, as she would approach any adult, even a stranger, seeking affection or attention. She would
wake up screaming and crying, thinking she was seeing the devil or demons. Castorena told her the
devils were watching her. M.D. told him about being hit with beer bottles that Castorena threw
when he was angry at her. There was a lot of anger and arguing in the home. Sears diagnosed her
as being depressed and having post-traumatic stress disorder, in part because no adults in her life
protected her. M.D. spent a lot of her time trying to protect the younger siblings. M.D. discontinued
her visits with her mother about two or three months before trial because sometimes her mother
would be upset with her and not play with her and M.D. did not know why. M.D. also said that she
fears Castorena; she described incidents when she and the other children and Delgado would have
to hide from Castorena.

 F.H. began therapy in January 2002. She really did not want to talk much about her
life with Delgado and Castorena. She reported that Castorena had grabbed her arm and thrown a
beer bottle at her.


Events Between Removal and Trial


 According to McLaughlin, the visits between Delgado and the children were
unpredictable. Lorrie Browning, a CPS caseworker, said that Delgado would often spend thirty
minutes staring at the ground and not interacting with the children if she felt confronted by the
caseworker before the visit. In recent visits, Delgado interacted more with the children. At the time
of trial, M.D. had chosen not to visit with her mother because she was not comfortable anymore. 
Delgado attended only one permanency planning meeting out of three or four, although she did
attend counseling. Browning testified that Delgado took a parenting class, but one that was shorter
than the approved class. Browning did not have Delgado's current address.

 From July until December Castorena did not visit. In December, Castorena and
Delgado reunited. He started coming with Delgado, but missed several visits before trial. His visits
went fairly well and he actively played with the children. However, the children did not speak
Spanish and he insisted on speaking only Spanish which puzzled them.

 In January 2002, Delgado moved to North Texas. In April 2002, she obtained
employment with Hudson Industries and received a favorable report after four months of work. 
Delgado said that she and Castorena had purchased a mobile home in Cooke County. However, it
appears to be a contract for deed purchase because the "previous" owner is still the owner of record;
it is uncertain whether Delgado will own an interest such that she cannot be "evicted" again. In any
event, McLaughlin testified that the mobile home, which has no water service or septic system,
would be not be suitable for the girls. In August 2002, the mobile home was "red-tagged" as
uninhabitable because of the lack of a septic system. Nevertheless, Delgado continued to live there
and intended to bring the children to live there.


Termination Recommendation/Placement Plan


 Lori Browning, a CPS caseworker involved with this family, recommended that all
parental rights be terminated based on the lack of provision of any kind of stability or nurturing. In
her opinion, all of the children were at great risk of further abuse and neglect. Delgado was
emotionally unstable and prone to making choices that were not in the children's best interest. 
Against the advice of two therapists, she remained with Castorena in a volatile and violent
relationship. Browning said that the Department had been leaning toward termination in September
2001 because of a lack of progress; Delgado took no initiative to make changes. She testified that
Delgado had placed the children in dangerous circumstances, such as repeatedly leaving the children
in various places without an appropriate caregiver.

 Browning opined that Castorena also knowingly placed the children in dangerous
conditions by actions such as cutting off electricity in the mobile home in Kyle when they were still
living there, throwing them out of the home when they had no place to go, allowing them to live in
a car, failing to provide any support, and being willing for them to move to another inappropriate
situation, a mobile home without a septic tank. She said the placement with the foster family was
very healthy; the children have progressed developmentally, emotionally, and physically. Browning
testified that it is in the children's best interest that Delgado's and Castorena's parental rights be
terminated.

 McLaughlin, guardian ad litem, testified that the foster placement is working well. 
These foster parents are interested in adopting all four children. M.D. is now doing well in school
and continues therapy. McLaughlin testified that she believed that the last year [in foster care] is the
first time that the girls have spent one year in one place. She also expressed concern about the lack
of education that the children received when living with Delgado and Castorena, particularly M.D.'s
multiple and lengthy absences from school.

 The therapist, Sears, testified that M.D. wants to stay with her foster parents. She
likes having her sisters there and she likes her school. He said the improvements she has made have
come from the stability and structure provided in the last year. Her language has improved and is
now up to grade level. He is concerned about any change in the stability level of the children's
environment. He said that it was in the children's best interest for Delgado's and Castorena's rights
to be terminated.


Parents' Testimony


 Castorena acknowledged kicking Delgado and the girls out of the mobile home in
Kyle because he was angry. He said that he made a mistake. He acknowledged that he did not give
Delgado any financial assistance because he was upset. He said he loved all the children. However,
when asked, "Then why did you allow your children to live on the streets?" he answered, "Because
of that mistake that I made, just for that." He said he later tried to find the children. One of his
brothers told him that the Department had removed the children from Delgado.

 Castorena described the purchase of the mobile home. He purchased it from someone
from whom his brothers had made purchases; the home's owner was to keep track of the payments
"in a small piece of paper." He said that the mobile home would be Delgado's. He described
building onto the mobile home to make it bigger and give the girls their own bedrooms. He said that
he had permission from his brother to hook into the septic system on his brother's adjoining
property; "[it] doesn't take that much to put tubing from her trailer to the septic tank." Castorena
described the property as pleasant, close to a church and school. He said his brothers and their
families would help with child care while Delgado was at work. He said that he would support
Delgado and the children if his rights were not terminated.

 He discussed having completed an anger management class, but also denied being
a violent person. He denied ever throwing a beer bottle at any of the children. He received
counseling, which helped at first, but when Delgado started receiving counseling, then it did not help
and caused more clashes between the two. He thought she was generally a good mother. He also
said that he thought she was receiving some services "that she should not have been receiving. They
made a mistake in providing those services to her." He thought those services were hurting her
rather than helping her. When later asked what he meant, he said that he thought they put too much
pressure on her and that stress caused a miscarriage. However, the date of this event and connection
between it and any services provided was vague.

 Delgado testified concerning her living situation at the time of trial. She discussed
her job, getting a good review, and the mobile home and the improvements they were working on. 
She said she traveled from north Texas to San Marcos to visit the children. She said she wanted to
be independent of Castorena, which in part would involve her trying to get a GED. She claimed that
Maria Rodriguez knew Delgado's mother's phone number and had agreed to keep the children "until
I got on my feet." She denied that Castorena had ever hit M.D. with a beer bottle or been violent. 
She admitted having had an earlier period of fighting with Castorena and going to a women's shelter;
she was nine months pregnant and gave birth at the shelter. She discussed having taken a parenting
class and said that she had learned how to be more patient with the children.


Termination



 The natural right existing between parents and their children is of constitutional
dimensions. In re J.W.T., 872 S.W.2d 189, 194-95 (Tex. 1994); In re G.M., 596 S.W.2d 846, 846
(Tex. 1980); Wiley v. Spratlan, 543 S.W.2d 349 (Tex. 1976). A parent's relationship with his child
is a fundamental liberty interest protected by the Fourteenth Amendment. Santosky v. Kramer, 455
U.S. 745, 753 (1982); Lassiter v. Department of Soc. Servs. of Durham City, 452 U.S. 18, 27 (1981);
M.L.B. v. S.L.J., 519 U.S. 102, 119 (1966). The integrity of the family unit has found protection in
the Due Process and Equal Protection Clauses. Stanley v. Illinois, 405 U.S. 645, 651 (1972). 
Termination of the parent-child relationship is final and irrevocable and divests for all time the
parent and child of all legal rights, privileges, duties and powers with respect to each other except
for the child's right to inherit. Holick v. Smith, 658 S.W.2d 18, 20 (Tex. 1985). However, although
parental rights are of constitutional magnitude, they are not absolute. In re C.H., 89 S.W.3d 17, 26
(Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right." Id.

 Because termination of parental rights is such a drastic remedy and is of such weight
and gravity, due process requires the petitioner to justify termination by the heightened burden of
proof of "clear and convincing evidence." Tex. Fam. Code Ann. § 161.001 (West 2002); In re G.M.,
596 S.W.2d at 847. The Department must prove by clear and convincing evidence that (i) a parent
committed one of the acts or omissions set out in § 161.001(1) and (ii) that the termination of
parental rights is in the child's best interest. Tex. Fam. Code Ann. § 161.001; In re G.M., 596
S.W.2d at 847. "Clear and convincing evidence" means "the measure or degree of proof that will
produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2002); In re C.H., 89 S.W.3d 17,
19-25 (Tex. 2002); In re G.M., 596 S.W.2d at 847. This standard is an intermediate standard, falling
between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard
of criminal proceedings. See In re G.M., 596 S.W.2d at 847.

 The appropriate standard for reviewing a factual sufficiency challenge to the
termination findings is whether the evidence is such that a fact finder could reasonably form a firm
belief or conviction about the truth of the allegations. In re C.H., 89 S.W.3d at 25. In determining
whether the fact finder has met this standard, an appellate court considers all the evidence in the
record, both that in support of and contrary to the trial court's findings. Id. at 27-29. Further, an
appellate court should consider whether disputed evidence is such that a reasonable fact finder could
not have reconciled that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d 256, 266
(Tex. 2002). If the disputed evidence is so significant that a fact finder could not reasonably have
formed a firm belief or conviction, then the evidence is factually insufficient. Id. An appellate court
should specify its reasons for concluding that a reasonable trier of fact could not have attributed
disputed evidence in favor of the finding. This standard retains the deference an appellate court must
have for the fact finder's role. In re C.H., 89 S.W.3d at 26.


Termination Grounds


 "Endanger" means "to expose to loss or injury; to jeopardize." In re M.C., 917
S.W.2d 268, 269 (Tex. 1996). Endangerment of a child does not have to be established as an
independent proposition, but can be inferred from parental misconduct alone. Boyd v. Texas Dep't
of Human Servs., 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the conduct be directed
at the child or that the child actually suffers physical or emotional injury. Id.; In re B.B., 971 S.W.2d
160, 169 (Tex. App.--Beaumont 1998, pet. denied). (5) The conduct does not have to constitute a
concrete threat of injury to the child. In re M.J.M.L., 31 S.W.3d 347, 350 (Tex. App.--San Antonio
2000, pet. denied). The conduct does not have to occur in the presence of the child; it may include
conduct before the child's birth and both before and after the child has been removed by the
Department. In re B.B., 971 S.W.2d at 166-69. "Conduct" includes not only acts but omissions. 
In re M.J.M.L., 31 S.W.3d at 351; In re B.S.T., 977 S.W.2d 481, 484 (Tex. App.--Houston [1st
Dist.] 1989, no pet.).

 Under section 161.001(1)(E), the focus is on the parent's conduct; one specifically
looks to the parent's omissions and acts. In re P.S., 766 S.W.2d at 833, 835 (Tex. App.--Houston
[1st Dist.] 1989, no writ). If the parent displays a voluntary, deliberate, and conscious course of
criminal conduct, it qualifies as conduct that endangers the emotional well-being of the child. In re
J.N.R., 982 S.W.2d 137, 142 (Tex. App.--Houston [1st Dist.] 1998, no pet.). A showing of a causal
connection between the parent's conduct and any resultant injury or adverse effect to the child is not
required. Boyd, 727 S.W.2d at 533; In re M.J.M.L., 31 S.W.3d at 353; In re W.A.B., 979 S.W.2d
804, 808 (Tex. App.--Houston [14th Dist.] 1998, pet. denied).

 Under section 161.001(1)(D), the focus is on the "conditions or surroundings" that
endangered the child's physical or emotional well-being." In re P.S., 766 S.W.2d at 835. 
Inappropriate, abusive, or unlawful conduct by persons who live in the home of the child or with
whom the child is compelled to associate on a regular basis in his home inherently is a part of the
"conditions or surroundings" of the child's home under section 161.001(1)(D). In re B.R., 822
S.W.2d 103, 106 (Tex. App.--Tyler 1992, writ denied); In re W.S., 899 S.W.2d 772, 776 (Tex.
App.--Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of living
conditions, but also to the parent's conduct in the home). Section D permits termination because of
a single act or omission. In re R.D., 955 S.W.2d 364, 367 (Tex. App.--San Antonio 1997, pet.
denied). Neglect "can be as dangerous to the well-being of a child as direct physical abuse." In re
M.C., 917 S.W.2d at 270. Evidence that a child's medical needs have been neglected will support
a finding under section 161.001(1)(D). See In re A.P., 42 S.W.3d 248, 257 (Tex. App.--Waco 2001,
no pet.); In re A.M.C., 2 S.W.3d 707, 716 (Tex. App.--Waco 1999, no pet.). Evidence that a parent
has neglected the child's physical needs will also support a finding under section 161.001(1)(D). 
In re M.C., 917 S.W.2d at 270. Evidence that a parent has jeopardized the children's well-being by
allowing them to live in unsafe or unsanitary conditions will support a finding under 161.001(1)(D). 
In re M.C., 917 S.W.2d at 270.

 Appellant Delgado argues that the termination was simply a "social engineering
project" based on the Department's decision that Delgado and Castorena should not live together. 
After finding the placement with the foster parents proved satisfactory, termination was simply based
on a decision as to the children's best interest. Delgado argues that there is no basis for termination
under sections 161.001 (D) and (E) because the Department was relying entirely on a "few periods
of homelessness" and financial hardship. Appellant Castorena argues that the Department's only
basis for termination was the eviction at a time when they had no place to go. Castorena argues that
the Department produced no evidence concerning his knowledge. Both appellants, however,
minimize the totality of the evidence and the permissible inferences therefrom.

 In this case, both Delgado and Castorena engaged in violent criminal conduct. 
Delgado admitted to hitting Miguel Delgado with a hammer. She was convicted of terroristic threat
as a result of threatening Castorena's sister with a knife. Her probation was almost revoked, in part
because of threatening behavior toward Castorena. In the children's presence, she threatened to kill
Castorena. Castorena had assault charges brought against him. Although their violent conduct did
not always result in criminal charges, their pattern of behavior is similar to a deliberate course of
criminal conduct that endangers a child's emotional well being. See In re J.N.R., 982 S.W.2d at 143. 
 Both Delgado and Castorena attempted to minimize the level of violence in their
household. However, the trial court was not required to believe Delgado's recantation of her reports
to the Department concerning abuse by Castorena toward her and the children. Nor was he required
to disbelieve M.D.'s and F.H.'s description of violence and of being afraid of Castorena. The fact
finder could take note that, although Castorena was taking an anger management class and admitted
kicking the children out of the mobile home because he was mad, he nevertheless denied being a
violent person. Nor was the court required to believe that Delgado and Castorena would be able to
transform their relationship into one of being friends and working together for the children in view
of their long history of volatility. The fact finder could consider the couple's long history with the
Department as offsetting their short-term partial compliance.

 The Department had received multiple referrals on the family for various forms of
neglect. As detailed in the statement of facts, the children were often unsupervised or left with only
the six-year-old to take care of them. Their medical needs were neglected. They spent time living
in a mobile home without electricity, only to be kicked out and relegated to living in a car. Their
surroundings were often unsanitary. Four young girls were left in a house with nine unrelated adult
males, not always the safest of environments. Some referrals resulted in a finding of "reason to
believe," others were eventually dismissed. That each and every referral did not result in removal
does not diminish the overall pattern, particularly in view of the fact that the numerous referrals
occurred over a long time period and came from many different sources. The court also had before
it the testimony of several persons not affiliated with the Department who had observed the children. 
The court was not bound to accept the parents' assertions as to their future good intentions.

 The trial court had before it evidence from which it could reasonably form a firm
belief that the allegations were true. Accordingly, we overrule Delgado's and Castorena's issues.


Best Interest



 There are nine non-exhaustive factors that a court may consider in determining
whether a termination is in a child's best interest. Holley v. Adams, 544 S.W.2d 367 (Tex. 1976). 
The factors include: desires of the child; emotional and physical needs of the child now and in the
future; emotional and physical danger to the child now and in the future; parenting abilities of the
parties seeking custody; programs available to assist these persons; plans for the children by parties
seeking custody; stability of the home or proposed placement; acts of omissions committed by the
parent which may indicate that the existing parent-child relationship is not a proper one; and any
excuse for the acts or omissions committed by the parent. Id. at 372.

 A party seeking an involuntary termination of parental rights is not required to prove
all nine Holley factors as a "condition precedent" to termination. In re C.H., 89 S.W.3d at 27. The
absence of evidence regarding some of the factors does not preclude the fact finder from reasonably
forming a strong belief or conviction that termination is in a child's best interest, particularly if there
is undisputed evidence that the parental relationship endangered the safety of the child. Id. While
no single consideration is controlling, the analysis of evidence relating to one factor may be adequate
in a particular factual setting to support a finding that termination is in the best interest of the child. 
In re J.O.C., 47 S.W.3d 108, 115 (Tex. App.--Waco 2001, no pet.). A best-interest analysis may
be based not only on direct evidence but also on circumstantial evidence, subjective factors, and the
totality of the evidence as a whole. See In re S.H.A., 728 S.W.2d 73, 86 (Tex. App.--Dallas 1987,
writ ref'd n.r.e.).

 For the same reasons urged in their first issue, Delgado and Castorena contend that
the evidence is factually insufficient to support the trial court's finding that termination was in the
children's best interest.


Emotional and Physical Needs of the Children; Danger to the Children; Parental Abilities


 The need for permanence is a paramount consideration for a child's present and future
emotional needs. In re T.D.C., 91 S.W.3d 865, 873 (Tex. App.--Fort Worth 2002, pet. denied); In
re M.A.N.M., 75 S.W.3d 73, 77 (Tex. App.--San Antonio 2002, no pet.); Salas v. Texas Dep't of
Protective & Regulatory Servs., 71 S.W.3d 783, 792 (Tex. App.--El Paso 2002, no pet.). Children
require secure, stable, long-term, continuous relationships with their parents or foster parents. 
Lehman v. Lycoming County Children's Servs. Agency, 458 U.S. 502, 513 (1982). A fact finder may
consider the consequences of its failure to terminate parental rights. D.O. v. Texas Dep't of Human
Servs,, 851 S.W.2d 351, 358 (Tex. App.--Austin 1993, no writ).

 A fact finder may measure a parent's future conduct by her past conduct and
determine that it is a child's best interest to terminate her parental rights. See Davis v. Travis County
Child Welfare Unit, 564 S.W.2d 415, 421 (Tex. Civ. App.--Austin 1978, no writ). Although
evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, the fact
finder may permissibly infer that an adult's future conduct may well be measured by recent
deliberate past conduct as it relates to the same or a similar situation. May v. May, 829 S.W.2d 373,
376-77 (Tex. App.--Corpus Christi 1992, writ denied); see also Ray v. Burns, 832 S.W.2d 431, 435
(Tex. App.--Waco 1992, no writ) ("Past is often prologue."). Further, a fact finder may infer that
past conduct endangering the well-being of a child may recur in the future if the child is returned to
the parent. In re D.L.N., 958 S.W.2d 934, 934 (Tex. App.--Waco 1997, pet. denied). A fact finder
may also infer that a parent's past inability to meet a child's physical and emotional needs may
indicate the parent's future inability to meet those needs if the child is returned to the parent. In re
D.O., 851 S.W.2d at 356.

 The trial court properly could infer that Delgado's and Castorena's history of
instability and criminal conduct, all of which endangered the four children, might recur in the future
if the children were returned to them. See D.L.N., 958 S.W.2d 934; see also M.J.M.L., 31 S.W.2d
351; Ray, 832 S.W.2d at 435; May, 829 S.W.2d at 376-77; Davis, 564 S.W.2d at 421. The trial court
could also infer that Delgado's past inability or unwillingness to care for her four children is
indicative of the quality of care that Delgado is capable of providing for any of the children in the
future. The same analysis applies to Castorena; he actively interfered with the child's care by cutting
off their electricity and rendering them homeless; he also failed to help Delgado obtain pre-natal care
and was responsible for creating a situation in which Delgado gave birth once while in a shelter. See
D.O., 851 S.W.2d at 356; see also M.J.M.L., 31 S.W.2d at 351; Ray, 832 S.W.2d at 435; May, 829
S.W.2d at 376-77; Davis, 564 S.W.2d at 421.

 The trial court is not bound to accept the truth or accuracy of a parent's testimony,
either as to past actions or future intentions. D.F. v. State, 525 S.W.2d 933, 939-40 (Tex. Civ.
App.--Houston [1st Dist.] 1975, writ ref'd n.r.e.). Delgado testified that she has done everything
she needed to do to provide a safe environment for the children, yet she was still dependent on
Castorena for a place to live. Castorena cut off the electricity in the mobile home in which she and
the children were living and then evicted the family, including his two infant children, leaving her
to live on the street without food or money. The mobile home in which Delgado was living and
planned to live with the children was condemned for lack of a septic system. Delgado admitted that
her living conditions, subjecting the children to repeated abusive behavior, and moving frequently,
all had a bad effect on the children. At times, Delgado was less than candid with the court
concerning her contacts with the Department. The court was not bound to believe that she and
Castorena had turned their lives around.

 It is not in a child's best interest that he be made a guinea pig "upon whom [her]
parents should be allowed to practice until they might become more proficient in child care. See In
re Sneed, 592 S.W.2d 430, 432 (Tex. Civ. App.--Fort Worth 1979, no writ). In reviewing the
parental abilities of a parent, a fact finder can consider the parent's past neglect or past inability to
meet the physical and emotional needs of other children not the subject of the termination suit. In
re D.O., 851 S.W.2d at 356.

 Delgado has not shown an ability to be a parent to any of her four children. Sweet,
her pastor, who had a chance to observe her parenting and interaction with the children, testified that
she did not have the maturity or ability to take care of the children; she loved them like a ten-year-
old would love them. He said that he prayed that she would lose the children. Several individuals 
with whom she stayed testified about Delgado's propensity to leave the children with the six-year-
old while she went out. The guardian ad litem testified that it was in the children's best interest to
terminate Delgado's and Castorena's parental rights.


Programs Available; Plans for the Future


 A fact finder can compare the contrasting plans for a child by the parent and the
Department. See In re D.O., 851 S.W.2d at 356. A fact finder can consider whether the plans and
expectations of each party are realistic or weak and ill-defined. Id. In comparing the Department's
future plans for the children and Delgado's and Castorena's future plans, the trial court properly
could have concluded that the Department's plan for the children's future was more realistic. The
Department's plan is to have the current foster family adopt the four children. The foster parents
have provided a stable environment; the children who are old enough attend school and are doing
much better in school. By comparison, the fact finder could have concluded that Delgado and
Castornena's plans were vague; that planning on housing the children in a condemned mobile home
were harmful; and, based on the totality of the circumstances, that Castorena's assertions concerning
help from his family were not reliable.

 The trial court have before it clear and convincing evidence that termination was in
the best interest of the children. We overrule Delgado's and Castorena's second issues.


Conclusion



 We hold that clear and convincing evidence supports the trial court's findings as to
the grounds for termination and the best interest of the children. We have overruled all of the issues
presented and affirm the judgment of the trial court.



 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: April 29, 2004
1. Although Castorena and Delgado were represented by separate counsel at trial and on appeal,
much of the evidence overlaps and their appellate challenges are essentially the same.
2. Miguel Delgado and Jose Hernandez were represented by counsel at trial. Hernandez had
been deported to Guatemala. He had had no contact with F.H. since she was very young. Counsel
talked to Miguel Delgado by telephone. He was in the United States illegally and would not disclose
his whereabouts to counsel. When counsel called the same number again, she was informed that
Miguel Delgado had returned to Mexico. Miguel had made no effort to contact M.D. for years and
made no effort to respond to the contact concerning termination. No appeal was perfected on behalf
of either Miguel Delgado or Jose Hernandez.
3. CPS is the Child Protective Services Division of the Texas Department of Family and
Protective Services. References in the text will be to CPS or "the Department."
4. A file of reports on the contacts between the Department and the family was admitted in
evidence as a business record as well as the narrative testimony of the various caseworkers who
prepared the reports.
5. In re C.H., 89 S.W.3d 17, 26 (Tex. 2002), disapproved of the articulation of the standard of
review in a number of cases, including In re B.B.; In re B.S.T., 977 S.W.2d 481, 484 (Tex.
App.--Houston [1st Dist.] 1989, no pet.) (cited p. 15); In re J.N.R., 982 S.W.2d 137, 142 (Tex.
App.--Houston [1st Dist.] 1999, no pet.) (cited p. 15); In re D.L.N., 958 S.W.2d 934 (Tex.
App.--Waco 1997, pet. denied) (cited p. 20). None of the propositions for which these cases are
cited is affect by C.H.