# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00249-CV

**Suley Hilbers and Bradley Hilbers, Appellants**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

═══════════════════════════════════════════════════════════════════════
**FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT**
**NO. 29,347, HONORABLE EDWARD P. MAGRE, JUDGE PRESIDING**
═══════════════════════════════════════════════════════════════════════

## M E M O R A N D U M   O P I N I O N

Suley Hilbers and Bradley Hilbers appeal the termination of their parental rights to P.H. and S.H., their two daughters, after a jury trial. They challenge the legal and factual sufficiency of the evidence to support termination on the three statutory grounds found by the trial court. We affirm the judgment as to both parents.

## BACKGROUND

Mr. and Mrs. Hilbers are the natural parents of P.H., who was born on September 1, 2001, and S.H., who was born on November 5, 2003. The parents have a history of referrals to the Department of Protective and Regulatory Services dating from the birth of P.H., when staff at the hospital where she was born expressed concerns about the parents' ability to adequately care for the

child. Robert Hollas, an investigator with the Department, first visited the family at their mobile home in Rockdale after the birth of P.H. He found it cluttered and dirty, "smelling of neglect." After this visit, the family moved into a camping trailer. On a home visit, Hollas observed old food and condoms on top of the refrigerator. There was a six- or eight-inch hole in the wall of the trailer "and I could see outside through it." He considered the trailer a hazard for the child. After a voluntary removal and brief placement of the child with the grandfather, Donald Hilbers, the child was returned home. Over the next year, the Department continued to receive reports of physical neglect and neglectful supervision. The Department offered appellants family-based services such as parenting classes and counseling and psychological testing, but appellants did not participate in any of the services.

Over the next year, the Department received five additional reports of neglect, including (1) a December 2001 report that P.H. was not kept clean or changed regularly and had a bad rash and diarrhea, and that the home was filthy; (2) a January 2002 report that P.H. was sick with an ear infection and possible constipation and was usually in urine-soaked diapers, dog and cat feces covered the floor where the child played, and that an unrelated adult male was living with the family and another individual with a criminal history was observed there; (3) a later January 2002 report that P.H. was always filthy with dirty diapers and dirt on her body and that she was left in a car seat all day without being held by her parents, and that another child of Mrs. Hilbers's, not the subject of this case, had been removed from her care; (4) a March 2002 report that Mr. Hilbers had slapped Mrs. Hilbers in P.H.'s presence and that Mr. Hilbers was arrested; and (5) an October 2002 report that P.H. fell and was injured as her parents slept, that the home was filthy with stale food, dirty dishes, and trash all over the floor, and that the family had refused entry to a caseworker. The

Department continued to provide services to the family in an attempt to improve their conditions. Following Mr. Hilbers's arrest in March 2002, the case was forwarded for review for possible action and was then closed by a supervisor. The Department continued to provide safety services.

In February 2003, the Department ceased providing safety services. Although the caseworker had concerns about Mr. Hilbers's criminal history and the limited nature of the parents' ability to care for P.H., the caseworker could not always locate the family because they frequently moved. The case was closed and services were terminated due to the family's lack of cooperation and participation in services. The caseworker did not think there was enough information to file for court-ordered services.

On February 23, 2004, Robert Hollas, the investigator who had first made a home visit to the Hilberses' mobile home in September 2001, received a report of physical neglect concerning both children, P.H. and the baby, S.H. In a home visit on February 25, Hollas observed piles of dirty clothing, dirty dishes throughout the mobile home including on top of the television set, little food except beer in the refrigerator, and old trash. P.H. appeared to have diaper rash. Hollas discussed the unsanitary conditions with the parents and they agreed to clean the house and enter into a safety plan. The family then moved. Upon receiving a report that the children were living in unsanitary conditions and that Mr. Hilbers was unstable, Hollas located the family through information received from a Rockdale police officer. On March 12, Hollas made a home visit at a residence located in a motel-type building at the USA Food Mart on a busy road with "a lot of traffic" just off of Highway 79. Hollas testified that the location was dangerous because of the traffic and drug dealing in the vicinity. Hollas observed piles of clothes, spoiled food, and a "general smell of neglect in the home."

3

He made a follow-up visit on March 25 and, despite his admonitions to appellants on the prior visit, found the home in the same shape as before. Because appellants had not addressed his concerns, he referred the case to Family Based Safety Services. Because of appellants' past noncompliance with the Department's guidelines, the Department requested and obtained an order for removal of the children.

When Hollas and the removal team of three Rockdale police officers arrived at the residence, there was no answer at the door, and Hollas found the parents with P.H. in a nearby apartment down the hall. When they returned to the Hilberses' apartment, the door was unlocked and five-month-old S.H. was inside alone. The children were removed and the Department was appointed temporary managing conservator of both children.

The parents entered into a court-ordered family service plan that required the parents to cooperate with the Department in case planning goals, obtain and maintain stable housing and employment, participate in individual therapy, and each pay support of $100 per month to the Department, and required Mr. Hilbers to submit to a psychological/sex offender evaluation, receive sex offender treatment, and successfully complete his probation. A subsequent order directed Mr. Hilbers to successfully complete anger management classes. The Department conducted a home study on Debra Brown, Mr. Hilbers's mother, and recommended that the children not be placed with her.

Although the Department initially planned to reunite the children with appellants, after months of unstable housing and non-compliance with court orders, the Department filed suit to terminate the couple's parental rights. The jury found by clear and convincing evidence that the

4

appellants had committed conduct constituting grounds for termination and that termination of the couple's parental rights was in the children's best interest. The jury also found that the Department should be appointed the managing conservator of both children. In accordance with the jury's verdict, the trial court terminated appellants' parental rights.

## ANALYSIS

Appellants contend that the evidence was legally and factually insufficient to support the judgment terminating their parental rights. They challenge only whether there was sufficient evidence for the jury to find the grounds for termination and do not challenge the jury's finding that termination was in the best interest of the children. The trial court included three statutory grounds in its order terminating appellants' parental rights: (i) knowingly placing or allowing the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, (ii) engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, and (iii) failure to comply with the provisions of a court order that establishes the actions necessary for the parent to obtain the return of the child. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O) (West Supp. 2005).

### *Standard of Review in Cases Requiring Proof by Clear and Convincing Evidence*

For a trial court to sever the fundamental interest a parent has in the care, custody, and management of a child there must be clear and convincing evidence proving at least one statutory ground for termination and that termination is in the child's best interest. *Id.* § 161.001; *see also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (natural right that exists between parent and child

5

is of constitutional dimension).  Only one ground must be found, coupled with a finding that termination is in the child's best interest, for the termination to be upheld.  Tex. Fam. Code Ann. § 161.001.  "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  Tex. Fam. Code Ann. § 101.007 (West 2002).

In reviewing the legal sufficiency of evidence supporting termination, we look at all evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding is true.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We assume the fact-finder—here, the jury—resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence it could have reasonably disbelieved.  *Id.*  Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis.  Therefore, in conducting a legal sufficiency review in a parental termination case, we must consider all of the evidence, not just that which favors the verdict.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).  If we find no fact-finder could reasonably form a firm belief or conviction that the matter to be proven is true, we must conclude the evidence is legally insufficient.  *J.F.C.*, 96 S.W.3d at 266.

In determining the factual sufficiency of evidence supporting the termination, we also employ a heightened standard of review.  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  A finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.  *Id.* at 25.  In considering whether evidence rises to the

6

level of being clear and convincing, we must consider whether the evidence is sufficient to produce in the mind of the fact-finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id*. at 24. We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

Because the natural rights that exist between parents and their children are of constitutional dimension, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Holick*, 685 S.W.2d at 20-21. However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26.

***Conduct and Surroundings that Endanger the Children***

In their first four issues, Mr. and Mrs. Hilbers assert that the evidence is legally and factually insufficient to support a finding that they endangered the children with their conduct or through their surroundings. The jury was instructed that in order to terminate the parent-child relationship, they had to find by clear and convincing evidence that both parents endangered the children's physical or emotional well-being *either* by their conduct *or* by means of their surroundings *and* that termination of the parent-child relationship would be in the best interest of the children. As to both children, the jury made an affirmative finding that the relationship between both parents

7

and the children should be terminated. Although we must find that the evidence is legally and factually sufficient to support only one of the bases, for the sake of completeness, we consider the evidence pertaining to these two grounds as well as the third ground.

Subsections (D) and (E) provide statutory grounds for termination when a child is endangered by a parent's knowing acts or omissions. *Id*. To prove endangerment under subsection (D), the Department had to prove that appellants knowingly placed or allowed their children to remain in conditions or surroundings that endangered their physical or emotional well-being. *Id*. Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the appellants' conduct, including acts, omissions, or failures to act. *Id*. Unlike subsection (D), the source of the danger must be the parent's conduct alone.

Endangerment occurs when a child is exposed to loss or injury, or the child's emotional or physical health is jeopardized. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The danger to a child must arise solely from the parent's conduct as established by the parent's actions or by the parent's failure to act. *See Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Although "endanger" means more than a "threat of metaphysical injury or the possible ill effects" of a dysfunctional family, it does not require that the conduct be actually directed at a child or that a child suffer an actual injury. *Boyd*, 727 S.W.2d at 533. That is, the conduct does not have to constitute a concrete threat of injury to the child. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied). The conduct does not have to

8

occur in the presence of the child. *Director of Dallas County Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ). And the conduct may occur before and after the child's birth. *In re S.M.L.D.*, 150 S.W.3d 754, 757-58 (Tex. App.—Amarillo 2004, no pet.). Unsanitary conditions may qualify as surroundings that endanger a child. *M.C.*, 917 S.W.2d at 270. Endangerment may be satisfied by showing that a parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *In re U.P.*, 105 S.W.3d 222, 223 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Appellants both contend that neither endangerment ground is supported by legally or factually sufficient evidence. They urge that when the children were removed from the home, they were not ill or injured, did not need medical attention, and were properly fed. A local police officer had reported the condition of one of the children as "fine." They contend that testimony that the younger child was asleep in a room "some 35 to 50 feet away from where the investigator met with the parents" overstates the danger and that she was not harmed or left alone for any "meaningful" period of time. They urge that appellants are guilty only of being poor. We disagree with appellants' characterization of the record and their involvement with the Department.

At trial, Hollas testified to the Hilberses' extensive involvement with the Department. He testified that the parents endangered the children both by their conduct and neglect. He characterized the history of the case as chronic, and testified that upon arriving at the residence to remove the children, he found the baby left alone in an unlocked motel room in an area known for drug and criminal activity. Based on his numerous visits and observations, Hollas felt that the children were placed or allowed to remain in conditions and surroundings that endangered their

9

physical or emotional well-being, and that both parents engaged in conduct that endangered the children.

The jury heard testimony that Mr. Hilbers has two assault convictions and that he failed to successfully complete probation for either offense. The jury saw photographs taken by police after Mr. Hilbers assaulted his wife, showing bite marks on Mrs. Hilbers. Mrs. Hilbers testified that she wanted the State to drop the case because the incident had been her fault: she said that she started the argument and "I deserved it, and he was calming me down." She testified, "I would have actually hurt him because I'm the type of person if you lay your—when I'm angered at him at all, I will actually hurt him physically."

The jury heard evidence that Mr. Hilbers had been accused of sexual abuse of a five-year-old mentally retarded child in April 2001, prior to P.H.'s birth. Although Mr. Hilbers was never prosecuted for the offense, his psychologist recommended that he undertake and complete sex offender treatment and determined that he should not be allowed to have contact with children. Although Mr. Hilbers completed the psychological sex offender evaluation, he did not follow through with therapy. Soon after the children were removed from the Hilberses' home and placed in a foster home, P.H. began acting in a sexually inappropriate manner. After referral by the foster mother and evaluation by a licensed professional counselor, the counselor testified at trial that she had concluded that the child had been exposed to "a sexual act in person," had witnessed "some incredibly graphic television," or "things have been done to her." The counselor described other disturbing behavior typical of young children exposed to sexual behavior. She concluded that the children needed a structured and stable environment to meet basic needs.

10

Following the removal of the children from the home, Mr. and Mrs. Hilbers lived with Mr. Hilbers's mother, Debra Brown. There were altercations in the home and Brown asked Mr. Hilbers to leave. Renee Blake, a Department conservatorship worker, continued to work with the parents, but they had difficulties even without the children. During this period, both parents found and lost jobs, lived in a local church, and then briefly moved into a home of their own. Mr. Hilbers refused to undertake treatment with one therapist and reportedly found another, but that therapist testified at trial that he had never been contacted by Mr. Hilbers. Mr. Hilbers also refused to complete anger management classes, the conditions of his probation, or any of the services required by his court-ordered plan.

After six months of assistance, Blake testified that the family had made no progress in meeting the goals of the family service plan, and that their situation was "dismal":

> They've moved quite a bit. I haven't known where they've lived a lot of the time. I asked for addresses of where they were living, telephone numbers to reach them. . . . I had a very hard time knowing where they were, making contact with them to even, you know, lots of times work on service. The times that I saw the parents were only at their visitations.

Blake stated that she did not believe either parent was able to provide a safe and secure home and that appellants had not demonstrated they could provide long-term stability and safety for the children. Although the Department's goal had initially been to reunite the family, after months of instability, the Department sought termination. At that point, neither parent had steady employment or stable housing. Appellants were living apart and Mr. Hilbers tested positive for methamphetamine.

Ruth Halpert-Nunez, a clinical social worker who provided counseling services to Mrs. Hilbers, testified that her primary concern was that Mrs. Hilbers had little insight into how her lifestyle could cause potential problems or risks for her children, and that she did not seem to have the motivation to make any changes. According to Halpert-Nunez, Mrs. Hilbers had a long-term pattern of ineffectual problem-solving that would make it difficult for her to address the obstacles of multiple moves, the long history of Department involvement without any significant changes, lack of job skills, and limited resources to take care of herself or her children emotionally or physically. Halpert-Nunez testified that in October 2004 Mrs. Hilbers told her that she was homeless and concerned that Mr. Hilbers was with another woman who might be pregnant, that he was using drugs, and that he had lost a job because he could not get along with others. In February 2005, Mrs. Hilbers obtained a job at Wal-Mart. By the time of trial, she had worked at Wal-Mart for three months. Halpert-Nunez concluded that she did not see signs of the family becoming stable over time and "I still see risk."

Many of the facts already recited support the finding that the parents knowingly placed or knowingly allowed their children to remain in conditions that endangered their well-being. The record reflects that home life was unstable with the parents often moving and, from time to time, living with friends or acquaintances. When they had a home, it was unsanitary, as evidenced by spoiled food and animal feces in the house. Witnesses characterized the home as unsafe, and testified that the parents' failure to clean and remove the hazards placed the children in physical danger. Blake, the conservatorship caseworker, recounted that the Department had worked with the parents and offered services since P.H.'s birth and concluded that the problems were chronic and the

12

chaos endangered the well-being of the children. We hold that a reasonable jury could have found by clear and convincing evidence that these conditions and appellants' conduct endangered the physical well-being of the children. We overrule appellants' first four issues.

***Failure to Comply with Court Order***

The third ground relied upon in granting termination was that both parents failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of their children. *See* Tex. Fam. Code Ann. § 161.001(1)(O). They challenge only the legal sufficiency of the evidence to support this ground. Section 161.001(1)(O) provides that parental rights may be terminated if the court finds by clear and convincing evidence that (i) the parent failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the child (ii) who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months, and (iii) the child's removal from the parent was a result of abuse or neglect of the child. *Id.* It is undisputed that the Department had temporary conservatorship from April 6, 2005, until the time of trial in April 2005 when, as a result of the jury findings, the court appointed the Department as the permanent managing conservator of the children.

Both parents failed to comply with material provisions of the court-ordered plans and there was clear and convincing evidence that was legally sufficient to support a finding of termination on that ground. At trial, the Department introduced evidence of the various court orders setting out the necessary actions for both parents. Although the evidence showed that Mrs. Hilbers made some efforts to comply with the Department's goals and the court orders, she failed to obtain

13

and maintain employment until just before trial, pay child support to the Department, participate in therapy and follow recommendations, complete recommendations from psychological evaluation, and obtain and maintain stable housing. The parents often refused to advise the conservatorship worker where they were living. Although Mrs. Hilbers made some attempts to participate in therapy, her participation was sporadic until she lost contact with her therapist and social worker.

With regard to Mr. Hilbers, the conservatorship worker testified that he expended almost no effort to comply with the court orders. He failed to complete drug and alcohol assessment, pay child support, obtain and maintain stable housing, follow through with the recommendations from his psychological sex offender evaluation, complete anger management, successfully complete his probation, and accomplish his case planning goals. Mr. Hilbers did not comply with the court orders in significant respects: He was unsatisfactorily discharged from probation because he failed to meet with his probation officer and complete anger management classes, he tested positive for methamphetamine use on one occasion and showed other indications of drug use, and he failed to maintain stable housing. The conservatorship worker testified that, to her knowledge, Mr. Hilbers never had stable housing, that he lived with various individuals throughout the case except for two weeks when he and Mrs. Hilbers lived in the trailer on Highway 79, and that he would never tell her where or with whom he was living. Appellants' fifth issue is overruled.

After careful review, we are persuaded that the record contains clear and convincing evidence that is legally and factually sufficient to support the jury's findings that appellants (1) allowed the children to remain in conditions and surroundings that endangered their physical or emotional well-being; (2) engaged in conduct that endangered the children's physical or emotional

14

well-being; and (3) failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of their children.

## CONCLUSION

Because there is legally and factually sufficient evidence to support all three of the statutory grounds for termination of appellants' parental rights under section 161.001 of the family code, *see* Tex. Fam. Code Ann. § 161.001, we overrule their issues and affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   May 5, 2006