

## Fourth Court of Appeals
### San Antonio, Texas

## CONCURRING OPINION

No. 04-22-00651-CV

In the Interest of **E.L.S.**, a Child

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-02002
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice
Concurring Opinion by:     Liza A. Rodriguez, Justice, joined by Lori I. Valenzuela, Justice

Sitting:     Patricia O. Alvarez, Justice
             Liza A. Rodriguez, Justice
             Lori I. Valenzuela, Justice

Delivered and Filed: March 8, 2023

I join the majority opinion but write separately to voice my concerns about the predicaments faced by alleged fathers in termination proceedings. Appellant, who was an alleged father, was faced with substantial delays in ordering genetic testing, in adjudicating his parental status, and in appointing an attorney to represent him. I am troubled by the way these delays kept Appellant on the periphery of the legal proceedings. I am also troubled that Appellant, who was not a member of the child's household at the time of removal, was required to participate in court-ordered services before he was adjudicated the child's parent.

*Relevant Factual Background*

When the Department filed its original petition for emergency removal and termination on November 19, 2021, the child was a newborn. The Department's petition named another man as

the child's only alleged father. In December 2021, a Department caseworker learned that Appellant was another possible father of the child and that he was serving a sentence in a local jail. Appellant was not married to the child's mother.

In January 2022, the caseworker met with Appellant at the jail and told him about the child. Appellant responded by indicating to the caseworker that if he was the child's biological father, he would like to have a relationship with her. Although Appellant was not a member of the child's household at the time of removal and had not been adjudicated the child's parent, the caseworker prepared a service plan for him, which required Appellant to: (1) truthfully participate in a substance abuse assessment, (2) follow "any and all recommendations made on the [substance abuse] evaluation," (3) adhere to random drug screenings and yield negative results to all substances; and (4) participate in parenting education classes and provide the Department with a certificate of completion.

On January 31, 2022, the Department amended its pleadings to name Appellant as an additional alleged father.

On February 3, 2022, and prior to his adjudication as a parent, the Department filed Appellant's service plan with the trial court and it was approved and made an order of the court.

On April 5, 2022, the trial court signed an order for genetic testing for Appellant.[1]

On June 7, 2022, the Department filed the genetic testing results with the trial court.[2] Nothing indicates that Appellant caused or contributed to the delay in obtaining the genetic testing

---

[1] Even though the Department was aware of Appellant's location since December 2021 and amended its pleadings in January 2022 to include him as an alleged father, it did not serve him with its termination suit until April 20, 2022.

[2] Although Appellant did not legally become the child's father until he was so adjudicated by the trial court on June 9, 2022, a presumption of paternity was created when the genetic testing results were filed with the court on June 7, 2022. *See* TEX. FAM. CODE § 160.505(a) (providing that a man is rebuttably identified as the father of a child based on specific genetic testing results). The genetic testing results filed in this case appear to comply with the statute's requirements.

results. The Department was aware of Appellant's location for the duration of the case. In fact, a Department caseworker met with Appellant at the jail on a monthly basis. During one of these meetings, Appellant asked the caseworker when an attorney would be appointed to represent him, and the caseworker advised him that the court would appoint an attorney to represent him after the genetic testing was completed.

On June 9, 2022, the trial court made a finding that Appellant was the child's biological father and signed an order establishing the parent-child relationship between him and the child.

On June 10, 2022, the trial court appointed an attorney to represent Appellant.

On September 13, 2022, the case was called for trial on the merits. At the time, the child was only ten months old, and the Department's termination suit had been pending for less than ten months. The suit's mandatory dismissal date was still more than two months away. *See* TEX. FAM. CODE § 263.401(a) (providing for the mandatory dismissal of termination suits after one year if a trial on the merits has not started or a proper extension has not been obtained). Appellant's attorney announced "not ready," and asked the trial court for a short reset because she had been appointed to represent Appellant late in the case. The trial court admitted that Appellant's attorney had been appointed late, but nevertheless denied her reset request, remarking that "due process has played out well enough."

*Delays in Genetic Testing, Adjudicating Parenthood, and Appointing Counsel*

As the above-mentioned timeline shows, the Department learned that Appellant was a potential father in December 2021, but it neglected to obtain an order for genetic testing until April 5, 2022. The family code provides that "a court shall order a child and other designated individuals to submit to genetic testing if the request is made by a party to a proceeding to determine parentage." *Id*. § 160.502(a). The fact that Appellant was one of two alleged fathers did not provide an excuse for the Department's delay. The Department was entitled to obtain genetic testing for

both alleged fathers simultaneously. *See* TEX. FAM. CODE 160.502(c) (providing that "[i]f two or more men are subject to court-ordered genetic testing, the testing may be ordered concurrently or sequentially.").

After the trial court signed the order for genetic testing for Appellant, two more months elapsed before the Department filed the genetic testing results with the court. The genetic testing results, which were filed on June 7, 2022, showed that Appellant was the child's biological father.[3] Two days later, on June 9, 2022, the trial court signed an order establishing the parent-child relationship between Appellant and the child. The following day, on June 10, 2022, the trial court appointed an attorney to represent Appellant.

The Texas Supreme Court has recognized that "[p]arents face a complex and nuanced family-law system that is challenging to navigate without the guidance of counsel." *In re B.C.*, 592 S.W.3d 133, 137 (Tex. 2019). "Considering the importance of the fundamental rights at issue, the Legislature has adopted important safeguards in section 107.013 and 263.0061 to help ensure parents will not be deprived of their parental rights without due process of law." *Id*. Section 107.013 provides that in a suit filed by a governmental entity seeking termination of the parent-child relationship, the trial court shall appoint an attorney ad litem to represent the interests of an indigent parent who responds in opposition to the termination. TEX. FAM. CODE § 107.013(a)(1). It also provides that when a parent is not represented by an attorney at the parent's first appearance in court, the court shall admonish the parent of the right to be represented by an attorney and that if the parent is indigent and appears in opposition to the suit, the right to an attorney ad litem appointed by the court. *Id*. § 107.013(a-1). Section 263.0061 requires the trial court to admonish unrepresented parents who appear at status and permanency hearings of their right to be

---

[3] The record indicates that the other alleged father's genetic testing results, which excluded him as the biological father of the child, were completed on May 12, 2022, almost a month earlier than Appellant's genetic testing results.

represented by an attorney, and if the parents are indigent and appear in opposition to the suit, the right to a court-appointed attorney. TEX. FAM. CODE § 263.0061.

I am aware that this court has held that the due process rights of indigent parents are not necessarily violated when the court appoints an attorney to represent them late in the proceedings. *See In re C.Y.S.*, No. 04-11-00308-CV, 2011 WL 5971068, at *5 (Tex. App.—San Antonio Nov. 30, 2011, no pet.) (holding the trial court did not abuse its discretion in appointing attorney to represent parent ten months after suit was filed and four months before trial); *In re M.J.M.L.*, 31 S.W.3d 347, 353-54 (Tex. App.—San Antonio 2000, pet. denied) (holding that the appointment of an attorney six months after the Department filed its termination petition did not violate section 107.013, especially considering that the attorney was appointed over a year before the trial date).

Notwithstanding this precedent, I am troubled by the trial court's delays in adjudicating Appellant's parentage and in appointing an attorney to represent him. These delays were precipitated by the Department's failures to obtain a timely order for genetic testing and to secure and file the genetic testing results. The Department first made contact with Appellant in January 2022 and the trial court terminated his parental rights on September 13, 2022. For much of this time—more than five months—Appellant's relationship to the child was uncertain and, as a practical matter, he was precluded from participating in the legal proceedings. The docket sheet shows that the trial court held four hearings prior to trial: a Chapter 262 hearing on December 1, 2021; a status hearing on February 1, 2022; a permanency hearing on May 16, 2022; and a permanency hearing on September 6, 2022. Three of these four hearings occurred before an attorney was appointed to represent Appellant, and it is unknown from the record whether he was even present.

*Required Participation in Services*

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). "This natural parental right has been characterized as 'essential,' 'a basic civil right of man', and 'far more precious than property rights.'" *Id.* "Termination of parental rights is traumatic, permanent, and irrevocable." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20-21.

The family code defines a "parent" as "the mother, a man presumed to be the father, a man legally determined to be the father, a man who has been adjudicated to be the father," "a man who has acknowledged his paternity under applicable law, or an adoptive mother or father." *Id.* § 101.024(a). It defines an "alleged father" as "a man who alleges himself to be, or is alleged to be, the genetic father or a possible genetic father of a child, but whose paternity has not been determined." TEX. FAM. CODE § 101.0015(a). "The term does not include a presumed father." *Id.* § 101.0015(b).

Two of our sister appellate courts have recognized that the service plan provisions in the family code do not apply to persons who are merely alleged fathers. *See In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *7 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) ("Notably, under the statute, a service plan applies only to parents, not to an alleged father."); *In re J.W.*, 615 S.W.3d 453, 468 (Tex. App.—Texarkana 2020, pet. denied) ("[U]ntil Appellant was adjudicated to be J.W.'s father, neither the Department nor the trial court had the authority to require him to perform services."); *see also* TEX. FAM. CODE § 263.102 ("Service Plan: Contents"; referring to "parent" throughout); *id.* § 263.103 ("Original Service Plan: Signing and Taking Effect"; referring to "parent" throughout); *id.* § 264.203 ("Required Participation"; authorizing the

department to sue to request a temporary order requiring "the parent, managing conservator, guardian, or other member of the child's household to participate in [] services.").

As the Texarkana court of appeals explained in *J.W.*: "[W]here the alleged father does not fall within the category of persons listed in Section 264.203, is a stranger to the child's household, did not engage in the acts that required removal of the child from that household, and does not know but only suspects he is the child's father, the Department must 'put the horse in front of the cart'—it must first adjudicate the father as parent and then it may proceed to order services and compel the production of information." *J.W.*, 615 S.W.3d at 472; *accord In re A.J.D.*, No. 04-20-00607-CV, 2021 WL 2117929, at *2 (Tex. App.—San Antonio May 26, 2021, no pet.) (citing section 264.203 and recognizing that because appellant, who was an alleged father, was a member of the household when the child was removed, "the trial court was permitted to order him to engage in services while he remained an alleged father.").

In the past, this court has considered a service plan created for an alleged father before he was adjudicated a parent when evaluating the sufficiency of the evidence to support a finding of reasonable efforts to return the child to the parent under section 161.001(b)(1)(N). *See In re Z.F.S.*, No. 04-20-00489-CV, 2021 WL 603372, at *3-4 (Tex. App.—San Antonio Feb. 17, 2021, no pet.) (concluding the department's implementation of a service plan for an alleged father five months prior to trial demonstrated reasonable efforts to return the child even though the alleged father was not adjudicated a parent until shortly before trial). However, in *Z.F.S.*, the alleged father did not argue that the family code's service plan provisions precluded the department and the trial court from requiring him to perform services before he was adjudicated the child's parent and this court did not construe these provisions.

In my view, the practice of ordering alleged fathers, who are not members of the child's household and have no legal relationship to the child, to participate in a service plan presents "an

untenable dilemma" for them. *See J.W.*, 615 S.W.3d at 471. "Should [alleged fathers] refuse to engage in services until it is confirmed they are the child's father, their refusal could be used against them to terminate their subsequently adjudicated parental rights." *Id*. "On the other hand, should they voluntarily perform the Department's services and produce the requested information and genetic testing subsequently eliminates them as the father, they will have submitted to an extensive invasion of their privacy . . . by a government agency that had no authority to require such services and obtain such information otherwise." *Id*.

Here, Appellant willingly participated in the services ordered by the trial court, completing a parenting education course and participating in a substance abuse program until it was discontinued by the jail. But it is understandable why alleged fathers in similar situations would be reluctant to engage in services and provide information to service providers until after their parentage is adjudicated.

Paradoxically, before Appellant's parentage was adjudicated, he was treated as a "parent" for purposes of requiring him to engage in services, but he was not treated as a "parent" for purposes of appointing an attorney to represent him. Appellant was ordered to participate in court-ordered services, even though he was not a member of the child's household at the time of removal and had no legal relationship to the child. While the Department amended its petition to add Appellant as an alleged father on January 31, 2022, and a caseworker met with him at the jail each month, the Department neglected to obtain a court order for genetic testing for Appellant until April 5, 2022, and it failed to file the results of Appellant's genetic testing until June 7, 2022. As a consequence, Appellant was not adjudicated the child's father until June 9, 2022, and an attorney was not appointed to represent him until June 10, 2022. During the five-month period in which Appellant's parental status was in limbo—half the duration of the termination suit—Appellant was

unrepresented by an attorney and, as a practical matter, precluded from participating in the legal proceedings.

While I agree that we must affirm the termination judgment, I cannot condone the procedures employed in this case. With these observations, I respectfully concur.

Liza A. Rodriguez, Justice