NO. 07-08-0377-CR

NO. 07-08-0378-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



APRIL 15, 2009



______________________________





PETER CAUDILLO, APPELLANT



v.



THE STATE OF TEXAS, APPELLEE



_________________________________



FROM THE 64TH DISTRICT COURT OF HALE COUNTY;



NOS. A12823-9710 AND A12824-9710; HON. ED SELF, PRESIDING



_______________________________



Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Appellant, Peter Caudillo, pro se, filed a notice of appeal of revocations of
community supervision. Appellant was placed on community supervision after being
convicted of manufacture or delivery of a controlled substance in penalty group one. 
Following revocation, the trial court sentenced appellant to two years incarceration in the
State Jail Division of the Texas Department of Criminal Justice in each cause and
assessed a $10,000 fine in cause number 07-08-0378-CR. We dismiss these appeals for
want of prosecution.
Â Â Â Â Â Â Â Â Â Â After appellant filed his notice of appeal, both the clerk and reporter filed motions
for extension of time to file the record indicating that appellant had neither paid or made
arrangements to pay for preparation of the records nor had designated the items to be
included in the records in these causes. We granted the clerk and reporter extensions of
30 days. However, upon reaching the extended deadlines, we again received motions for
extension from both the clerk and reporter which indicated that appellant had still not paid
or made arrangements to pay for the record nor had designated the items to be included
in the records. We again granted the clerk and reporter extensions of 30 days. In addition,
by letters dated January 28, 2009 and January 30, 2009, this Court informed appellant of
his failure to comply with the requirements of Texas Rule of Appellate Procedure 35.3 and
gave him until March 3, 2009 to ensure that the records were filed with this Court or to file
a certification from the clerk and reporter that appellant had complied with the rule. See
Tex. R. App. P. 35.3(a)(2), (b)(2), (3). Appellant was also notified, by these letters, that a
failure to comply with the rule could result in the appellate court deciding those issues that
do not require a reporterâs record, see Tex. R. App. P. 37.3(c), or dismissal of the appeals
for want of prosecution, see Tex. R. App. P. 37.3(b). To date, appellant has not responded
to our letters nor have we received any indication from the clerk or reporter that appellant
has taken appropriate action to comply with the requisites of the rule. In fact, on March 4,
2009, this Court received a third request for extension of time to file the clerkâs record that
again indicates that appellant has not paid or made arrangements to pay for preparation
of the clerkâs record.
Â Â Â Â Â Â Â Â Â Â Because no clerkâs record has been filed in these appeals due to the fault of
appellant and after this Court has afforded appellant reasonable opportunity to comply with
the requisites, we now dismiss these appeals for want of prosecution. See Tex. R. App. P.
37.3(b).


Mackey K. Hancock

Justice

Do not publish.



EM> at §161.001(O) (stating the same). So too did it conclude that termination would
be in the best interests of the children. See id. at Â§161.001(2) (stating that termination
must also be in the best interests of the children). Thus, it entered an order terminating
her parental relationship with the children.

Issue Three -- Admissibility of the Children's Hearsay Statements


 We initially address issue three since it affects the nature of the evidence we can
consider when assessing the other issues. Via that issue, Caren argues that the trial court
erred in admitting "hearsay statements by [her] children because such statements were not
supported by 'sufficient indications of the statement's reliability.'" We overrule the issue.

 Standard of Review

 Whether the trial court erred in admitting evidence depends upon whether it abused
its discretion. In re K.S., 76 S.W.3d 36, 42 (Tex. App.--Amarillo 2002, no pet.). 
Furthermore, it abuses its discretion when the decision fails to comport with controlling
rules and principles, id., or when the decision lacks evidentiary support in the record. 
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). Yet, should
an evidentiary ruling constitute an abuse of discretion, the case will not be reversed unless
the error is harmful, that is, unless it probably caused the rendition of an improper
judgment. Id; see Tex. R. App. P. 44.1(a); see also Gee v. Liberty Mut. Fire Ins. Co., 765
S.W.2d 394, 396 (Tex.1989). This normally obligates the complainant to show that the
judgment turned on the particular evidence excluded or admitted. In re K.S., 76 S.W.3d
at 42.

 Next, hearsay statements of a child 12 and under describing alleged abuse of the
child are admissible in a suit affecting the parent/child relationship under certain
circumstances. Among other things, the trial court must find that the time, content, and
circumstances of the statements provide sufficient indications of reliability. Tex. Fam.
Code Ann. Â§104.006 (Vernon 2002). (3) 

 Application of Standard

 First, Caren never describes, with particularity, the specific testimony she deemed
objectionable. Instead, she simply states that the "trial court allowed Mrs. Flores and Ms.
Griffin to say what [P.E.W.] told them and Ms. Ackley to say what [K.M.W.] told her." It is
not our duty to search the reporter's record for evidence which may fall within the issue
before us. Most Worshipful Prince Hall Grand Lodge v. Jackson, 732 S.W.2d 407, 412
(Tex. App.--Dallas 1987, writ ref'd n.r.e.); see Rendleman v. Clarke, 909 S.W.2d 56, 58
(Tex. App.--Houston [14th Dist.] 1995, writ dism'd) (stating that an appellate court 
has no
duty to search a voluminous record without guidance from the appellant to determine
whether an assertion of reversible error is valid). Because Caren, when explaining her
issue, neither cited us to the particular evidence which she considered hearsay nor
otherwise referenced the comments, she did not preserve her complaint about same. (4) 

 Second, assuming arguendo that 1) the issue had been preserved and 2) the
evidence in question was that uttered by P.E.W. and K.M.W. describing Caren's own
sexual molestation of the children and her knowledge of that committed by Paul Sr., we
would nevertheless conclude that the trial court did not reversibly err in admitting it. With
regard to that of P.E.W., the child stated that he knew the difference between truth and 
lies. One "get[s] busted" and sent to his room when he lies, according to the boy. So too
did he state that one does not "get busted" when telling the truth, that he knew how to tell
the truth, and that the truth is when "[y]ou don't lie anymore." 

 Also of note is the evidence indicating that many of P.E.W.'s statements regarding
the sexual abuse he suffered were volunteered, while some resulted from questioning. 
Additionally, Caren admitted that a child of his age would not normally know about the
matters he described. Indeed, it is quite difficult to believe that P.E.W., a five year old at
the time, had the mental ability to fabricate the explanation he gave his foster mother for
masturbating. According to the child, "when mom plays with it, it feels good and it tickles
. . . [w]hy can't I do it?" The boy also said that "it tickled" when his mother "sucked on his
pee-pee . . . ." Given this and the absence of argument by Caren that the foster mother
schooled the child's comments, it is reasonable to deduce that he could describe the acts
involved because he experienced them first hand.

 Next, various of the acts described by the boy were corroborated by other evidence. 
For instance, P.E.W. disclosed to a counselor how once his father sodomized him while
sitting on a bed. The youth tried to "scoot away . . . [but] his father would grab him by the
butt and bring him back to him." This same event was also described by K.M.W. when she
independently spoke to the counselor. Furthermore, K.M.W. stated that she and Caren
"were screaming and father would not let him go." While it may be that K.M.W. was also
of tender years, the similarity of the versions uttered by these children suggests that the
assault was more than a mere fabrication. Moreover, Caren later admitted, in court, that
she believed what her children were saying, at least with regard to what Paul Sr. did to
them. Medical examination of P.E.W. provided physical corroboration of his utterances
as well. His anal sphincter had been stretched. This was indicative of the child being
sodomized, according to the witness. Admittedly, the foregoing entails acts done to
P.E.W. by his father. Yet, to the extent those acts were corroborated by other matter
(including Caren's own concession alluded to above), it is some evidence of the boy's
reliability when speaking about the abuse he experienced at the hands of his mother. 
Much like the situation involving confidential informants, the reliability of their
representations in the past reflects on the reliability of the truthfulness of their present
statements. See Carmouche v. State, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). That
P.E.W.'s statements can be deemed reliable (even by his mother) when describing the
acts committed by his father is an indicia weighing in favor of concluding that his
statements were equally reliable when describing the sexual abuse committed by his
mother.

 Next, nothing of record indicates that P.E.W. had a motive to lie or fabricate when
describing the abuse he underwent; another factor Caren concedes. So too did Caren
have the opportunity to do that which P.E.W. said she did since he was in her custody
most all the time.

 In short, there appears of record evidence touching upon various indicia which
courts often use to assess the reliability of a child's outcry. See Norris v. State, 788
S.W.2d 65 (Tex. App.--Dallas 1990, pet. ref'd) (describing those indicia); Idaho v. Wright,
497 U.S. 805, 821, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 656 (1990) (describing like
indicia). More importantly, comparing those indicia to the evidence at bar provides basis
favorably supporting the trial court's conclusion that P.E.W.'s statements regarding the
misconduct of his mother were indeed reliable. Thus, it did not abuse its discretion in
admitting them. (5) 

Issue One - Sufficiency of the Evidence


 Under her first point, Caren asserts that there was insufficient "evidence to clearly
and convincingly establish that [she] had done or failed to do any of the activities listed in
V.T.C.A. Family Code Â§161.001(1)." We overrule the point.

 Standard of Review 

 The standard of review applicable to claims of legal insufficiency is discussed in
Leitch v. Hornsby, 935 S.W.2d 114 (Tex. 1996), and need not be reiterated. That
applicable to claims of factual insufficiency is discussed in In re C.H., 89 S.W.3d 17 (Tex.
2002). The latter standard is met if the evidence enables a reasonable jury to form a firm
belief or conviction that grounds existed for termination under the Texas Family Code. Id.
at 18-19. 

 Though the trial court found several statutory grounds warranting termination of the
parent/child relationship, we need not determine whether each enjoys the requisite amount
of evidentiary support. Instead, the decision may be affirmed if the evidence supports the
existence of one ground, In re S.F., 32 S.W.3d 318, 320 (Tex. App.--San Antonio 2000,
no pet.), assuming the State also proves that termination was in the best interest of the
child. See Tex. Fam. Code Ann. Â§161.001(1) & (2) (Vernon 2002) (stating that termination
may be ordered if the trial court finds, by clear and convincing evidence, the existence of
a statutory ground and that termination is in the best interests of the child). 

 Next, the parent/child relationship may be terminated if the parent has "knowingly
placed or knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann.
Â§161.001(1)(D) (Vernon Supp. 2003). The term "endanger" contemplates more than a
threat of metaphysical injury or the possible ill effect of less than an ideal family life. In re
A.P., 42 S.W.3d 248, 259 (Tex. App.--Waco 2001, no pet.). Yet, it does not require proof
of actual injury to the child, id., or even a concrete threat of injury. Texas Dept. of Human
Services v. Boyds, 727 S.W.2d 531, 533 (Tex. 1987). For instance, a child's exposure to
continually unsanitary living conditions, his continued uncleanliness, his medical needs
and lack of attention thereto, and his subjection to physically abusive parents are indicia
which may prove endangerment. See e.g., In re A.P., 42 S.W.3d at 257; Phillips v. Texas
Dept. Protective and Regulatory Serv., 25 S.W.3d 348, 354-55 (Tex. App.--Austin 2000,
no pet.); see also In re Tidwell, 35 S.W.3d 115, 117 (Tex. App.--Texarkana 2000, no pet.). 
He need not develop or succumb to a malady due to those conditions before it can be said
that endangerment arises. It is enough if the youth is exposed to loss or injury or his
physical or emotional well-being is jeopardized. In re M.J.M.L., 31 S.W.3d 347, 350-51
(Tex.App.-San Antonio 2000, pet. denied).

 Application of Standard -- Â§161.001(1)(D)

 The evidence of record depicts that P.E.W., K.M.W., and D.L.W. lived in squalid
conditions. Witnesses described the home as "filthy." The floors were dirty, and a witness
stated that she saw onions sprouting on the carpet. So too were cockroaches seen
throughout the house. Indeed, one described how they even crawled in and about baby
bottles. Dirty dishes also were seen sitting in a water-filled sink. Food was seen on the
floor, as were food containers lying about the kitchen. A caseworker also noted that the
toilet did not work and remained unflushed. Apparently, family members had to pour water
into the bowl to cause it to cycle. So too did the home smell horribly, lack running water
at times, and have "walls [that were] kind of falling down." 

 As one caseworker testified:

 Well, it was certainly not a very safe environment for the children. It was extremely cluttered and it wasn't just a few things laying around. I mean there was a lot of objects on the floor, on furniture. The floors were extremely
soiled. Part of the ceiling was trying to -- was caving in and falling down;
boxes piled everywhere. There was some -- lots of trash. It was just very,
very filthy and had an odor to it . . . [a] trashy odor, kind of an animal feces
or urine kind of odor.


 Outside the home, boards with rusty nails could be seen strewn about. "There was
just old tires and buckets, broken glass, boards, high weeds." A bathtub lay outside turned
upside down. "There was a stove out there," as well as an old trailer in "poor condition"
and surrounded by weeds, "real high up to it." Indeed, the housing conditions and Caren's
cleaning skills purportedly were so deficient that Paul Sr. threatened to take the kids and
leave. Moreover, K.M.W. suffered a cut requiring ten stitches as a result of coming into
contact with a nail in a closet. 

 Admittedly, effort was made to clean the environment. For instance, the State paid
an exterminator to kill the roaches, and that condition improved. Also, a neighbor helped
Caren clean the house on one occasion. On another occasion, a caseworker offered
Caren various resources to help her "fix this house up." They included "concrete services,
cleaning services, things like that that would help her if she needed things like this . . . ." 
She also offered to help Caren find volunteers to help. Yet, Caren "would always say, no,
she could do it herself; she just needed time." And, though the condition of the house
would improve somewhat after the State confronted her, it continually regressed to its filthy
state. (6) 

 Next, the uncleanliness experienced was not restricted to the home. The children
were also seen wearing dirty clothing. The hands of the youngest were found, by one
caseworker, to be black after the child crawled across the floor. Others noticed that the
children's diapers were soaked with urine and all of the children had diaper rash. One
child's rash was so severe that the witness saw skin peeling away. Yet, Caren testified
that she would treat the rash, and it would eventually heal. 

 That Paul Sr. exhibited violent tendencies also appears of record. He struck P.E.W.
in the face, causing him to suffer two black eyes. He did this out of anger, according to
Caren. Paul Sr. also struck his wife, as evinced by bruising on her body. And, that Paul
Sr. sexually abused P.E.W. and K.M.W. is undisputed. Though Caren professed
ignorance of this, she nevertheless admitted that he had once asked her permission to
"poke" K.M.W., a female child of three years. When Caren asked what he meant, he
replied: "you know, like I poke you." Another time, Caren saw K.M.W. straddling Paul Sr.
as he lay on the bed. Paul Sr. had an erection, and K.M.W. said "mommy, daddy's poking
my pee-pee with his pee-pee." As stated by Caren, she suspected Paul was molesting the
children, "but [had] no proof" despite the foregoing incidents. Yet, we are told of no effort
on the part of Caren to verify or disprove her suspicions. Indeed, she said, at one time,
that she continued to believe Paul Sr. was innocent even after he pled guilty to the criminal
charges levied against him. And, though she eventually mentioned her suspicions to a
caseworker, she waited several months after witnessing the K.M.W./Paul Sr. incident to
do so. On the other hand, the outcry of P.E.W. illustrated how Caren would play with and
suck on his penis and how she allowed him to touch her breasts.

 Finally, the record illustrates that P.E.W. suffered from belated educational
development while in the custody of Caren. Though five years old before his removal from
the house, he "never had any education at all . . . ." He did not know basic things like
"ABCs, one, two, three . . . ." "He didn't know his colors . .. how to spell his name . . .
anything." Nor did K.M.W. "[k]now her numbers, [or] her colors." Furthermore, those to
whom she spoke "had to really listen to see what she was saying." Since being placed
with foster parents, both children have learned many of those tasks. According to her
foster parent, K.M.W. is now "doing excellent." 

 The foregoing constitutes ample evidence entitling a reasonable jury to form a firm
belief or conviction that Caren knowingly placed or knowingly allowed her children to
remain in conditions or surroundings which endangered their physical or emotional well-being. Admittedly, she belittled or contradicted much of the testimony and evidence
harming her. Yet, the factfinder had the right to select who to believe, and we cannot say
it erred in opting to disbelieve her. In sum, the State proved at least one statutory ground
authorizing termination of Caren's parental rights, and because it did, we need not
determine if it proved others.

Issue Two -- Best Interests of the Children


 Through her second issue, Caren asks whether there existed "evidence to clearly
and convincingly establish that termination . . . [was] in the best interest of her children?" 
We answer yes.

 


 Standard of Review

 The applicable standards of review were discussed in the preceding issue. We
refer the litigants to it. We further note that much of the evidence establishing a statutory
ground for termination may also evince that the best interests of the child warrant
termination. In re C.H., 89 S.W.3d at 28. As acknowledged by the Supreme Court, "the
same evidence may be probative of both issues." Id. Also of note are the indicia which
have become known as the Holley factors. Espoused in Holley v. Adams, 544 S.W.2d 367
(Tex. 1976), they were considered helpful by that court in assessing the child's best
interests. Included among them are: 1) the desires of the child; 2) the emotional and
physical needs of the child now and in the future; 3) the emotional and physical danger to
the child now and in the future; 4) the parental abilities of the individuals seeking custody;
5) the programs available to assist these individuals to promote the best interest of the
child; 6) the plans for the child by these individuals or by the agency seeking custody; 7)
the stability of the home or proposed placement; 8) the acts or omissions of the parent
which may indicate that the existing parent-child relationship is not a proper one; and, 9)
any excuse for the acts or omissions of the parent. Though helpful in assessing the
situation, one need not prove that each Holley factor favors termination, however. Again,
all the State need do is present enough evidence from which the factfinder can reasonably
form a firm conviction or belief that the child's best interests warrant termination.

 


 Application of Standard

 In the mix, we include all the evidence described under issue one. We further note
that a caseworker and the children's counselor testified that termination would be in the
best interests of the children. That would facilitate their need to feel safe and secure. 
Moreover, since leaving the control of Caren, the children have matured academically,
physically, and to some extent emotionally. Also appearing of record is evidence that
Caren was unable to take immediate control of her offspring if she were to regain
possession of them. She had no job at the time of trial, was unable to pay her bills, had
her utilities disconnected, and moved in with another family. Additionally, the abode of the
family with which she was living was too small to accommodate three more children; thus,
she conceded that she could not take possession of the children until she sold her old
home. 

 Other evidence indicates that though she gave Paul Sr. money while he was in jail,
she provided her children with no financial support once they were removed. Also, K.M.W.
and D.L.W. had bonded well with their foster parents, who wished to adopt them. So too
had P.E.W. bonded well with his. 

 Next, the State made counseling accessible to Caren. Yet, she attended
sporadically and appeared concerned only with her problems, not with improving her
relationship with her children. Nor had she "accepted responsibility for the abuse and
neglect of her children." "She hasn't been able to provide a safe home and environment,"
according to one caseworker. This worker also opined that Caren was not appropriate with
her children during visits, that "she was very negative toward" them, that she yelled and
constantly criticized P.E.W. and ignored K.M.W. 

 The foregoing constitutes ample evidence enabling a reasonable jury to form a firm
belief or conviction that termination of the parent/child relationship was in the best interests
of the child. Thus, we overrule issue two.

 Accordingly, we affirm the final order terminating the parent/child relationship here
involved.

 Brian Quinn

 Justice

 

 



1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't
Code Ann. Â§75.002(a)(1) (Vernon Supp. 2003). 
2. The parental rights of the father were also terminated, but that termination has not been challenged
on appeal. 
3. At least one views this statute to be the civil corollary to art. 38.072 of the Texas Code of Criminal
Procedure. See e.g., In re K.L., 91 S.W.3d 1, 16 (Tex. App.--Fort Worth 2002, pet. filed).
4. Alternatively, in stating that the "trial court allowed Mrs. Flores and Ms. Griffin to say what [P.E.W.]
told them and Ms. Ackley to say what [K.M.W.] told her," one could reasonably say that Caren demarcated
the testimony that she thought inadmissible. That testimony consisted of the reiteration by Flores, Griffin,
and Ackley of the comments by P.E.W. and K.M.W. Yet, a fourth individual, Cheryl Polly, appeared as a
witness and also related to the jury comments she heard from those two children. And, her name goes
unmentioned in the litany of individuals who the trial court improperly allowed to testify improperly; again,
Caren only mentioned Flores, Griffin and Ackley. Given that 1) much of what Polly reiterated also involved
Caren's sexual abuse of the children and her knowledge of that committed by Paul Sr. and 2) Caren failed
to include Polly in the group of witnesses whom she believed testified improperly, we do not see how Caren
was harmed by the admission of the testimony by Flores, Griffin, and Ackerly. In re J.F.C.,96 S.W.3d 256,
285 (Tex. 2002).
5. Given our holding viz the utterances of P.E.W., we need not address those of K.M.W. Many were
cumulative of P.E.W.'s and none were any more damaging than his. So, to the extent that the trial court
correctly allowed the admission of his, we can see no harm in allowing the admission of hers assuming they
were not admissible. The factfinder need not have held that Caren sexually molested each child before it
could terminate her parental rights to each. It had basis to do so simply by finding that she molested one
or was aware of Paul Sr.'s molestation of one and kept him in that environment. Lucas v. Texas Dept. of
Protective and Regulatory Servs., 949 S.W.2d 500, 503 (Tex. App.--Waco 1997, pet. denied). In short, we
cannot say, after perusing the entire record, that the judgment turned upon K.M.W.'s statements or that there
exists any probability that the judgment would have differed had K.M.W.'s statements been excluded. In re
K.S., 76 S.W.3d 36, 42 (Tex. App.--Amarillo 2002, no pet.) (stating this to be the test for assessing harm).
6. Of course, Caren initially denied the testimony describing her house as filthy. Yet, she eventually
conceded that while it may not have been a safety hazard in her view, it was nevertheless in "bad shape"
and not "what it should be." Furthermore, effort was made to minimize (on appeal) the condition of her
house by stating that "Donna Reed she may not be." Being a good parent does not require one to act like
the fictional television characters portrayed by Donna Reed, June Cleaver, and the like. Nor does it permit
them to maintain their offspring in a non-fictional setting of squalor, decay, and vermin.