

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00058-CV

---

IN THE INTEREST OF J.L., A
CHILD

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

K.L. (Mother) appeals the termination of her parental rights to her child, J.L. We affirm.

### Background Facts

In February 2012, The Department of Family and Protective Services (DFPS or the Department) received a referral stating that Mother had given birth

---

[1]*See* Tex. R. App. P. 47.4.

to J.L. and that both Mother and the baby tested positive for marijuana. The referral also alleged that Mother had a black eye. DFPS investigator Lishawa Jackson interviewed Mother at the hospital and testified that she saw Mother's black eye. Jackson stated in Mother's service plan that Mother "appeared dishonest" and "failed to understand the severity of the . . . referral." The Department removed J.L. and placed him with his maternal aunt.

At the adversary hearing in February 2012, Mother and J.L.'s father (Father) were court-ordered to complete their service plans. The Department changed the goal of Mother's case from reunification to termination in August 2012 because Mother and Father were not making progress on their services.

A bench trial was held on February 4, 2013.[2] Mother did not appear at trial. The trial court found that Mother had engaged in conduct or knowingly placed J.L. with persons who had engaged in conduct that had endangered J.L.'s physical or emotional well-being, that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain J.L.'s return, and that termination of the parent-child relationship was in J.L.'s best interest.

Mother filed a motion to declare the judgment void on the grounds that she was not appointed counsel until almost eleven months after the Department filed

---

[2]Father signed a relinquishment of his parental rights immediately prior to trial. He is not a party to this appeal.

its original petition, and she filed a motion for new trial. The trial court denied both motions, and Mother filed this appeal.

## Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will

3

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

## Discussion

### I. Court-appointed attorney

In her first issue, Mother argues that the trial court erred by delaying the appointment of an attorney for almost nine months after she requested counsel. Mother complains that this delay violated her rights to equal protection and due process of law under the United States constitution, due course of law under the Texas constitution, and effective assistance of counsel.[3]

Section 107.013(a)(1) of the Texas Family Code guarantees indigent parents a right to counsel in a government-initiated parental rights termination case. *See* Tex. Fam. Code Ann. § 107.013 (West Supp. 2012); *In re B.L.D.*, 113 S.W.3d 340, 346 (Tex. 2003), *cert. denied*, 541 U.S. 945 (2004). "[I]n Texas the timing of appointment of counsel to indigent parents appearing in opposition to termination is a matter within the trial court's discretion. Therefore, in our due process review, we look to the facts and circumstances of this case to determine whether the trial court's action was arbitrary and a violation of [the parent's] due process rights." *In re M.J.M.L.,* 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied).

---

[3]Mother does not complain that, once appointed, her attorney provided ineffective assistance; she complains only of the delay in the appointment.

Mother had been admonished of her right to an attorney throughout the pre-termination proceedings. In February 2012, Mother was asked at a temporary orders hearing if she wanted to apply for an attorney and she said no. At the end of a permanency hearing on April 5, 2012, Mother requested court-appointed counsel. The trial court told her that she would be given paperwork to complete, and once she returned the papers, the trial court would make a determination regarding an appointment.

At a hearing in July 2012 at which Mother was not present, the trial court asked whether Mother had representation. Jessica Davis, a DFPS caseworker, stated that Mother had completed the application but that she was "not sure what happened with that." The trial court stated that it had looked through the case file and did not find Mother's application. The next hearing was held on October 18, 2012; Mother was not present.

In January 2013, another permanency hearing was held. Both Mother and Father attended. At the end of the hearing, the trial court stated,

> In this particular case, you guys have requested [an application for a court-appointed attorney], and I'm going to swear you in, have you swear to your applications here in just a minute. And then from everything I've heard, I most likely will be appointing you somebody here in just—just moments.

Although what transpired at that point was not on the record, the trial court found Mother indigent and appointed counsel for her.

Section 107.013(d) requires that a parent claiming indigence under the statute must file "an affidavit of indigence in accordance with Rule 145(b) of the

Texas Rules of Civil Procedure before the court can conduct a hearing to determine the parent's indigence under this section." Tex. Fam. Code Ann. § 107.013. Mother's affidavit of indigence is not in the record before us, but the trial court stated that Mother had not filed her application as of the July 2012 hearing.[4] The record does not show if Mother ever filed an affidavit with the trial court so that it could have proceeded with appointing counsel any sooner than it did. The record does reflect that the first time Mother presented any evidence concerning her financial ability to hire counsel was during the January 2013 hearing. Based on the record before us, we cannot say that the trial court erred by not appointing counsel before January 2013. *See In re J.J.*, No. 13-04-00202-CV, 2006 WL 949952, at *3 (Tex. App.—Corpus Christi Apr. 13, 2006, no pet.) (mem. op.) (holding that appointment of counsel eleven months after the petition for termination was filed, but four and one-half months before trial, did not violate section 107.013).

This delay in providing the affidavit of indigency is what distinguishes this case from *In re C.D.S.*, 172 S.W.3d 179 (Tex. App.—Fort Worth 2005, no pet.), on which Mother relies. In *C.D.S.*, the mother had completed and filed with the

_____

[4]In her reply brief, Mother argues that the delay in appointing counsel for her was because "one or more of the trial court's personnel dropped the ball" and because "[s]tandard operating procedure was not completed." We find nothing in the record to support these assumptions. In fact, the record shows that the trial court followed the statutorily mandated procedure. It provided Mother with an application. It could do nothing until Mother filed the completed forms. That she did not complete or file the application for some months after receiving them is not something for which we will hold the trial court responsible.

6

court an application for appointment of counsel with an attached declaration of financial inability to employ counsel on the same day that the Department filed its original petition. *Id.* at 182. The trial court found that the mother was not indigent and did not appoint counsel for her throughout the eight months the case was pending. *Id.* The mother in *C.D.S.* was representing herself when her parental rights were terminated pursuant to an affidavit of voluntary relinquishment of parental rights. This court determined that under those circumstances and the facts of mother's financial ability, the trial court erred in failing to find the mother indigent. *Id.* at 185. In the case at bar, the trial court appointed counsel on the first day that the record supports a finding of indigency.

Further, we cannot say that any error by the trial court was harmful. Mother does not complain of the quality of her attorney's representation once appointed, she only complains that the delay meant her counsel "[could not] be truly effective if appointed on the eve of trial." Mother complains that she only had one telephone meeting with her attorney prior to trial. However, her attorney stated at trial that he spoke to her two weeks before trial and that he tried calling her every day the week before trial but was unable to get in touch with her. He explained that because Mother and Father had not set up their shared cellphone's voicemail, he could not leave messages for them. The attorney also stated that to his knowledge, Mother made no attempts to call his office. Mother

7

had the opportunity to work with her appointed counsel, but chose not to communicate with him.[5]

The record shows that it was Mother's own acts, by delaying in filing her affidavit of indigence and by failing to return her attorney's calls, that impaired the effectiveness of her representation, not any acts by the trial court.[6] Mother has failed to show harm. *See Manning v. Tex. Dep't of Family & Protective Servs.*, No. 03-04-00451-CV, 2005 WL 1116389, at *4 (Tex. App.—Austin May 12, 2005, pet. denied) (mem. op.) (holding that any error in a year-long delay in the appointment of counsel was harmless because counsel effectively represented the father for five months). These facts do not show that the trial court acted arbitrarily in delaying appointment of counsel nor do they show that Mother was deprived of her constitutional rights. We overrule Mother's first issue.

---

[5]We also note that at the July 2012 hearing, the ad litem attorney appointed for the child told the court that five months earlier he had given Mother his card and told her, "I don't represent you, but at least let me give you a hand. Let me give you some advice." According to the ad litem, Mother never took advantage of the offer of free legal advice.

[6]Mother also complains that the late appointment prevented her from requesting a jury trial because her counsel was appointed less than thirty days from trial. *See* Tex. R. Civ. P. 216 (requiring a party to file a written request for a jury trial no less than thirty days before the trial setting). Courts have held, however, than when counsel is appointed less than thirty days before trial, thereby making compliance with Rule 216 impossible, a request for jury trial that is filed at the first opportunity is considered timely. *See In re J.C.*, 108 S.W.3d 914, 916–17 (Tex. App.—Texarkana 2003, no pet.).

## II. Endangerment

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding under subsection (E) of section 161.001(1) of the family code. *See* Tex. Fam. Code Ann. § 161.001(1)(E) (West Supp. 2012).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to

9

termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (E) of section 161.001(1). Tex. Fam. Code Ann. § 161.001(1)(E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary,

deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

**The evidence**

Jessica Davis, a caseworker for DFPS, testified that Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child through "[her] ongoing drug usage, knowingly using while pregnant, the domestic violence in the relationship . . . , as well as the inability to provide a stable and safe environment for [J.L.]."

Mother tested positive for marijuana twice during her pregnancy with J.L., when she went to the hospital in January and February 2012 thinking that she was in labor. J.L. tested positive for marijuana at birth. Mother first denied that she had smoked marijuana during her pregnancy, but later admitted that she had used. Mother claimed that she did not have an appetite and that smoking

11

marijuana helped her eat. Mother also admitted that she continued to smoke marijuana after learning that she was pregnant. Mother acknowledged that she received no prenatal care during her pregnancy with J.L.

Mother also had a previous referral for neglectful supervision of another one of her children in December 2008.[7] During that investigation, Mother "was taking the child to her paramour's home to smoke marijuana." She was advised at that time of the Department's concerns regarding her marijuana use and the drug's effects on her ability to parent.

Jackson, the DFPS investigator, testified that DFPS considered Mother's use of marijuana during her pregnancy as abusive. Not only was Jackson concerned about Mother's personal use of marijuana, but she was also concerned about the drug activity surrounding Mother and Father. Jackson testified that during Mother's pregnancy, Father had been shot during a drug deal.

Jackson testified that Mother initially denied that domestic violence occurred in the home she shared with Father but later stated that "he [had not] hit [her] in a while." Jackson testified that Mother had a black eye when she gave birth to J.L., although Davis admitted that she did not have a doctor or nurse confirm that it was a black eye. Mother told Jackson that she only had "bags

_____

[7]Mother has two other children, neither of which is in her care.

under her eyes." Mother later said that she did have a black eye but it was because Father had elbowed her in his sleep. Jackson said that domestic violence was an ongoing matter because Mother had not completed the necessary services to alleviate the Department's concern.

Jackson also testified that prior to removing J.L., she tried several times to meet with Mother so that she could see and approve Mother's home, but that she was not able to do so because Mother did not show up for scheduled meetings. Jackson testified that she was unable to verify whether Mother and Father "even had a residence to bring this child to." Jackson testified that not having a stable residence was a concern to the Department and a danger to J.L. Throughout the case, Mother and Father "kept giving [the Department] different addresses of people they never even knew," and the Department had difficulty getting in contact with Mother. Davis testified that she could not consistently reach Mother to request random drug testing. Davis also expressed concern over Mother's ability to provide for J.L. because, although Mother claimed to be employed at two points during the pendency of the case, Mother supplied no documentation of employment.

In August 2012, Mother appeared at a neighbor's apartment asking for refuge because Father had beaten her.[8] Two different police officers encountered her that night, and in one encounter, she identified herself by a fake

___

[8]She later represented to a police officer that she made up the story that she told the neighbor.

13

name.  After discovering her real identity, Denton police charged Mother with failure to identify herself as a fugitive.  Mother admitted that she had given a fake name because she had an open DFPS case.  Mother also stated that she was aware that she had warrants for her arrest and had given a fake name to avoid arrest.[9]

**Analysis**

Drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct.  *R.W.*, 129 S.W.3d at 739.  Despite repeated warnings from the Department regarding the danger to her children, both in a previous referral and in this case, Mother continued to use drugs through her pregnancy and during the pendency of her case.  *See J.T.G.*, 121 S.W.3d at 125 (noting that parental drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being); *see also In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *7–8 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.) (holding that mother's drug use supported endangerment finding); *In re Z.D.*, No. 02-07-00386-CV, 2008 WL 4354936, at *7 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and

---

[9]Mother was later convicted for failure to identify as a fugitive.

convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children.").

Although Mother denied domestic violence, there was evidence that Mother continued to be in a violent relationship with Father. There was also evidence that Father engaged in dangerous and criminal activity. Mother did not maintain stable housing or provide evidence of her employment. *See In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at *8 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (upholding finding of endangerment when father was, among other things, unable to provide stable housing and financially unable to care for his children). During the pendency of her case, Mother lied to a police officer about her name and was arrested. Evidence of criminal conduct, convictions, and imprisonment will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133. Engaging in criminal conduct subjects a child to a life of uncertainty and instability because of the probability that his parent will be jailed thereby leaving the child alone. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

Mother argues that there is no evidence to support the trial court's subsection (E) finding because J.L. was removed only days after his birth. Yet Mother continued to engage in endangering activity during the year her case was pending. Further, a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *See*

15

*In re J.D.B.*, No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth Aug. 2, 2007, no pet.) (mem. op.); *In re C.S.C.*, No. 02-06-00254-CV, 2006 WL 3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.). Mother also claims that "the child does not appear to have suffered any ongoing harm from any prenatal cause." We note that there was evidence that J.L. suffered from jaundice and required "numerous doctors' appointments" during the first few months of his life. We also note that a finding of endangerment does not require actual injury to the child. *Boyd*, 727 S.W.2d at 533.

We conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed J.L. with persons who engaged in conduct that endangered J.L.'s physical or emotional well-being. We overrule Mother's second issue. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need not address Mother's third issue, which challenges the termination under subsection (O). *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

16

## Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's judgment.


                                    LEE GABRIEL
                                    JUSTICE

PANEL:  DAUPHINOT, GARDNER, and GABRIEL, JJ.

DELIVERED:  July 18, 2013